## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **ROBERT HAGOPIAN,**<br>16 Hagopian Ct.<br>Madison, ME 04950<br><br>**DUANE R. LANDER,**<br>P.O. Box 1113<br>Greenville, ME 04441<br><br>**STERLING B. ROBINSON,** and<br>1330 Atlantic Highway<br>Warren, ME 04864<br><br>**JAMES T. TRUDEL,**<br>616 Fuller Rd.<br>Hermon, ME 04401<br><br>               **Plaintiffs,**<br><br>    v.<br><br>**MATTHEW DUNLAP,** *in his official capacity as*<br>Secretary of State of Maine,<br>148 State House Station<br>Augusta, Maine 04333-0148<br><br>**AARON FREY**, *in his official capacity as*<br>Attorney General of Maine,<br>6 State House Station<br>Augusta, ME 04333<br><br>**JANET MILLS,** *in her official capacity as*<br>Governor of Maine,<br>#1 State House Station<br>Augusta, ME 04333<br><br>               **Defendants.** | Case No. _____<br><br><br>**DECLARATORY AND<br>INJUNCTIVE RELIEF<br>SOUGHT** |

## <u>COMPLAINT</u>

Plaintiffs Robert Hagopian, Duane R. Lander, Sterling B. Robinson, and James T. Trudel,

by and through undersigned counsel, file this Complaint against Matthew Dunlap, the Secretary

of State of Maine, Aaron Frey, the Attorney General of Maine, and Janet Mills, Governor of Maine, in their official capacities, seeking declaratory and injunctive relief on an expedited basis in order to protect their rights to participate fully in the 2020 general election.

## INTRODUCTION

1. This case seeks to vindicate the constitutional rights of Mainers who will soon be denied full participation in the 2020 general election.

2. In 2017, Maine became the first—and only—state in our nation's 233-year-long constitutional tradition to adopt an electoral system known as "ranked-choice voting."

3. The Maine Act to Establish Ranked-Choice Voting ("RCV Act") burdens the voting rights of all Mainers. In 2018, it subjected nearly two-thirds of those voters who showed up at the polls on Election Day to a serious risk of disenfranchisement. And it, in fact, disenfranchised a substantial number of voters. The same will happen to Maine voters in the 2020 election if this Court does not intervene.

4. The RCV Act permits voters to rank multiple candidates on their ballots in order of choice. But this opportunity comes at a very high cost. Under the RCV Act, ballots are tabulated in "rounds." Me. Rev. Stat. tit. 21-A, § 723-A(2). And the RCV Act requires each voter to "rank" enough candidates on his or her ballot to ensure that it "continu[es]" to be counted in the determinative "final round." *Id.* §§ 723-A(1)(B), (D), 723-A(2), 723-A(3). A voter who fails to mark enough candidates is at risk of having his or her ballot "exhausted" and his or her vote "not counted" in the election round that "determine[s] the winner." *Id.* § 723-A(2).

5. Maine conducted its first general election under the RCV Act in 2018. The results for Maine voters were abysmal. Although Mainers share a proud democratic tradition that boasts an average rate of full voter participation that is above 97%—meaning that, among Mainers who choose to

vote, nearly all of them complete their ballot in a manner that guarantees that it will be counted in the final tally—under ranked-choice voting, the rate of full voter participation plunged to just *37.7%* in the 2018 Maine Congressional Election. The primary elections were similar: more than half of all voters failed to completely fill out their ballots. Put differently, the majority of Mainers who participated in these elections were at risk of having their votes discarded even though they showed up at the polls and cast legal ballots on Election Day.

6. The risk became reality for tens of thousands of Mainers. Maine exhausted more than *40,000* of the ballots that voters cast in its 2018 ranked-choice elections. These exhausted ballots were "not counted" in the election round that "determine[d] the winner." Me. Rev. Stat. tit. 21-A, § 723-A(2). Rather, those votes were ignored so that Maine could purportedly declare a "majority" winner.

7. And that is only part of the story. An analysis of town level data from the 2018 general election shows a strong empirical relationship between the number of Maine voters failing to achieve full participation and the number of voters in that town who were over 65 or lacked a college degree. In other words, the burden on voting rights is falling most heavily on older voters and those with the lower levels of educational attainment.

8. The sharp decline in full voter participation in Maine's 2018 elections cannot be dismissed as anomalous. The academic literature confirms that low rates of full participation and high rates of ballot exhaustion are a common and persistent feature of ranked-choice elections across jurisdictions.

9. These problems will not go away. Empirical studies find no correlation between the length of time a jurisdiction has employed ranked-choice voting and ballot exhaustion rates. In other words, the failure of nearly *300,000* Maine voters to fully complete their ballot in Maine's 2018

ranked-choice elections cannot be attributed to the novelty of the system.

10. If anything, the problem is likely to worsen this election. The ongoing COVID-19 pandemic all but guarantees that a much larger portion of voters will submit absentee ballots in 2018. Without the ability to obtain in-person voting assistance, it is likely that even more Mainers will inadvertently miscast their ranked-choice ballots.

11. The low rate of full participation under the RCV Act also cannot be explained by voter choice. Ballot data from Maine's 2018 ranked-choice elections—as well as Plaintiffs' own experiences—show voting patterns that are inconsistent with choice and that many voters are confused regarding how to effectuate their vote. Indeed, that the RCV Act disproportionately affects the full participation of older and less-educated voters demonstrates a very serious problem with the system that will continue in the 2020 general election and beyond if this Court does not intervene.

12. In addition, if voters were choosing not to fully participate, one would expect the drop off between rounds in ranked-choice elections to be similar to the drop off between rounds in traditional runoff elections. But it is twice as high. And that is so even though full participation in a majority runoff system requires voters to cast one ballot in the initial election, and then to show up at the polls a second time and cast another ballot in the runoff election. Although this system requires two trips to the polls rather than just one, jurisdictions that use majority runoff elections see average rates of full voter participation (*i.e.*, percentages of voters who show up at the first and second election) from 56% to 91%—much higher than under RCV.

13. It is unreasonable for the State to impose a voting system that it concedes is more complex than plurality and runoff voting, then dismiss as "voter choice" empirical evidence that voters as a whole, and older and less educated voters in particular, struggle to achieve full participation

under that system.

14. In addition, even many voters who understand the RCV Act and how to fully participate in the RCV system are put in an untenable position. That is, many voters—including Plaintiff Robert Hagopian—wish to ensure that their ballots are counted, but do not wish to be forced to vote for other candidates. The only choice these voters have is a Hobson's Choice—they can either risk ballot exhaustion or cast votes for candidates they find objectionable.

15. The problems with the RCV Act are manifest in this case.

16. Plaintiffs will be injured by the RCV Act in the general election for Maine's United States Senator set for November 3, 2020 (the "2020 Senatorial Election").

17. The identities of the candidates who will advance to the general election for the 2020 Senatorial Election were determined by the primaries held on July 14, 2020. Those candidates are Susan Collins (R), Sara Gideon (D), Max Linn (I), and Lisa Savage (I). Because this is a four-candidate election, "[r]anked-choice voting will be used." Sec'y State, *Upcoming Elections*, Maine.gov, https://www.maine.gov/sos/cec/elec/upcoming/index.html (last visited July 16, 2020).

18. Specifically, Plaintiffs are Mainers who intend to vote in the 2020 Senatorial Election and want to guarantee that their ballots are counted regardless of what unfolds.

19. Plaintiffs are concerned that the complicated RCV ballot may cause them to spoil their ballots or to otherwise effectuate results they do not intend.

20. The threat of ballot exhaustion compels some Plaintiffs to rank more candidates than they otherwise would. This burdens Plaintiffs by forcing them to form and express nuanced opinions about the relative merits of candidates for whom they would not otherwise vote.

21. In addition, the threat of ballot exhaustion burdens some Plaintiffs by forcing them to rank candidates they find objectionable in order to ensure that their ballots are counted in the final result.

The RCV Act puts these voters to a Hobson's Choice:  express support for and associate with candidates they disapprove of, or risk losing the fundamental right to have their votes counted.

22. The State will not provide Plaintiffs with notice or an opportunity to cure if the State decides to exhaust their ballots.

23. To achieve its so-called "majority" standard, the RCV Act must disenfranchise enough voters to permit one candidate to be deemed the "winner" among the remaining voters.

## PARTIES

24. Plaintiff Robert Hagopian is a resident of and registered as a Republican to vote in Somerset County, Maine.  Ex. B (Declaration of Robert Hagopian ("Hagopian Declaration")), ¶¶ 4, 7.

25. Mr. Hagopian is 73 years old and of sound mind.  *Id.* ¶ 2.

26. Mr. Hagopian is a citizen of the United States and of the State of Maine.  *Id.* ¶ 3.

27. Mr. Hagopian resides at 16 Hagopian Ct., Madison, ME 04950.  *Id.* ¶ 4.

28. Mr. Hagopian is a former eighth grade science teacher and currently runs his own business, an indoor firing range.  *Id.* ¶ 5.

29. Mr. Hagopian received an undergraduate degree from William Penn University in 1969. *Id.* ¶ 6.

30. Mr. Hagopian received a Master's in education from the University of Southern Maine in the early 1980s.  *Id.*

31. Plaintiff Duane R. Lander is a resident of and registered as a Republican to vote in Piscataquis County, Maine.  Ex. C (Declaration of Duane R. Lander ("Lander Declaration")), ¶¶ 4, 6, 7.

32. Mr. Lander is 79 years old and of sound mind.  *Id.* ¶ 2.

33. Mr. Lander is a citizen of the United States and of the State of Maine. *Id.* ¶ 3.

34. Mr. Lander resides at 12 Rail Lane, Harford's Point Twp., Maine, 04441, and his mailing address is P.O. Box 1113, Greenville, ME 04441 in Piscataquis County. *Id.* ¶ 4.

35. Mr. Lander is a United States Army veteran and retired engineer. *Id.* ¶ 5.

36. Mr. Lander attended classes at the University of Maine and graduated from the Wentworth Institute of Technology in Massachusetts in 1963. *Id.* He graduated from the Army School of Engineers in 1964 and from Bryant and Stratton Business School in Massachusetts in 1968. *Id.*

37. Mr. Lander actively participates in Republican Party politics in his county. He has served as the Chairman for the Piscataquis County Republican Committee on several occasions. He served as a member of the Maine House of Representatives from 1984–1986. He was also a delegate on behalf of the State of Maine to the Republican National Conventions in 1992 and 1996. *Id.* ¶ 7.

38. Plaintiff Sterling B. Robinson is a resident of and registered as a Republican to vote in Knox County, Maine. Ex. D (Declaration of Sterling B. Robinson ("Robinson Declaration")), ¶¶ 4, 8.

39. Mr. Robinson is 72 years old and of sound mind. *Id.* ¶ 2.

40. Mr. Robinson is a citizen of the United States and of the State of Maine. *Id.* ¶ 3.

41. Mr. Robinson resides at 1330 Atlantic Highway, Warren, ME 04864 in Knox County. *Id.* ¶ 4.

42. Mr. Robinson is an eighth generation Maine resident and currently resides in a home built by his family, which is one of the only remaining original homes that was built on the Waldo Patent land grant. *Id.* ¶ 5.

43. Mr. Robinson is retired but was previously employed in a number of different positions,

including as a tractor trailer driver and an office manager and personal assistant to a listed artist. *Id.* ¶ 6.

44. Mr. Robinson attended several years of post-secondary education at the University of Maine in 1967 to 1968. *Id.* ¶ 7.

45. Mr. Robinson participated in the Continuing Education Division and did not receive an undergraduate degree. *Id.*

46. Plaintiff James T. Trudel is a resident of and registered as an Independent to vote in Penobscot County, Maine. Exhibit E (Declaration of James T. Trudel ("Trudel Declaration")), ¶¶ 4, 7.

47. Mr. Trudel is 73 years old and of sound mind. *Id.* ¶ 2.

48. Mr. Trudel is a citizen of the United States and of the State of Maine. *Id.* ¶ 3.

49. Mr. Trudel resides at 616 Fuller Rd, Hermon, ME 04401 in Penobscot County. *Id.* ¶ 4.

50. Mr. Trudel is a retired Lieutenant Colonel of the Maine National Guard and former electrical engineer. *Id.* ¶ 5.

51. Mr. Trudel received a Bachelor of Science in Electrical Engineering from University of Maine in Orono in 1984. *Id.* ¶ 6.

52. Matthew Dunlap ("the Secretary") is the Secretary of State of Maine and is sued in his official capacity.

53. The Secretary is responsible for preparing ranked-choice ballots in accordance with state law and furnishing those ballots to municipalities. Me. Rev. Stat. tit. 21-A, §§ 601, 606.

54. The Secretary tabulates the results of ranked-choice ballots. *Id.* § 722.

55. The Secretary is charged with instructing political subdivisions and voters on the procedures for carrying out ranked-choice voting. *Id.* § 605-A.

56. The Secretary may delegate ministerial duties to others under his supervision.  *Id*. § 2.

57. Defendant Aaron Frey ("the Attorney General") is the Attorney General of Maine and is sued in his official capacity.

58. The Attorney General is charged with enforcing Maine's election laws.  *Id*. § 33.

59. Defendant Janet Mills ("the Governor") is the Governor of Maine and is sued in her official capacity.

60. The Governor is responsible for certifying the results of elections in Maine.  *Id*. § 724.

## JURISDICTION AND VENUE

61. This Court has subject matter jurisdiction over this action because it arises under the laws and Constitution of the United States.  28 U.S.C. § 1331.  Specifically, this action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 to enforce the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution.

62. Venue is proper in this District because all Defendants reside in Maine and because a substantial part of the events giving rise to Plaintiffs' claims occurred within this judicial District. *See* 28 U.S.C. §§ 1391(e)(1)(A), (B).

63. Venue is proper in this Division because a substantial part of the events giving rise to the claims herein occurred within Kennebec, Piscataquis, and Somerset Counties.  D. Me. Local R. 3(b).  Plaintiff Robert Hagopian is a registered voter residing in Somerset County.  Hagopian Declaration ¶¶ 4, 7.  Plaintiff Duane R. Lander is a registered voter residing in Piscataquis County. Lander Declaration ¶¶ 4, 6.   Plaintiff James T. Trudel a registered voter residing in Penobscot County.  Trudel Declaration ¶¶ 4, 7.  Ranked-choice ballots are tabulated in Kennebec County.

64. Plaintiffs each have Article III standing because they intend to vote in the 2020 Senatorial Election, and that election will be subject to ranked-choice voting.  *See* Sec'y State, *Upcoming*

*Elections*, Maine.gov, https://www.maine.gov/sos/cec/elec/upcoming/index.html (last visited July 16, 2020) ("Ranked-choice voting will be used in the 2020 State Primary and General elections.").

65. Plaintiff Robert Hagopian will be injured by the RCV Act because the threat of ballot exhaustion compels him to rank candidates he finds objectionable in order to ensure that his ballot is counted, or to give up his fundamental right to vote.  Hagopian Declaration ¶¶ 8–20.

66. Plaintiff Duane R. Lander will be injured by the RCV Act because he plans to rank only Susan Collins in the 2020 Senatorial Election, and the Secretary may exhaust his vote before the final round.  Lander Declaration ¶¶ 15–16.  He also does not understand how to ensure his vote is counted, despite his own research and being an active political participant.  *Id.* ¶¶ 12–13.  The confusing nature of the RCV ballot presents Lander with choices that may cause him to effectuate a result he does not intend, thus undermining his voting interests and/or causing his ballot to be exhausted.  *Id.* ¶¶ 12–17.  Further, the State will not provide Lander with notice or an opportunity to challenge an exhaustion decision.

67. Plaintiff Sterling B. Robinson will be injured by the RCV Act because the threat of ballot exhaustion compels him to develop plans to rank each candidate and form nuanced opinions about the relative merits of candidates for whom he would not otherwise vote.  Robinson Declaration ¶¶ 16–18.  Robinson is further injured because the confusing nature of the RCV ballot presents him with choices that may cause him to effectuate a result he does not intend, thus undermining his voting interests and/or causing his ballot to be exhausted.  *Id.* ¶¶ 18–19.  Further, the State will not provide Robinson with notice or an opportunity to challenge an exhaustion decision.

68. Plaintiff James T. Trudel will be injured by the RCV Act because the threat of ballot exhaustion compels him to rank candidates he finds objectionable in order to ensure that his ballot is counted, or to give up his fundamental right to vote.  Trudel Declaration ¶¶ 8–20.

69. Plaintiffs' injuries are caused by the RCV Act and are redressable by this Court.

## THE MAINE RCV ACT

70. Maine enacted the Act to Establish Ranked-Choice Voting in 2017. *See* I.B. 2015, ch. 3; *see also* L.D. 1557, §§ 1–6 (referred to the voters, 127th Legis. 2016) (effective Jan. 7, 2017).

71. The RCV Act establishes a system wherein voters must "rank" enough candidates to ensure that their ballot continues to and is counted in the final, determinative round. *See* Me. Rev. Stat. tit. 21-A, § 723-A(2).

72. Under the Secretary's rules, each voter "rank[s] as many candidates as they wish . . . in order of choice." 29-250-535 Me. Code R. § 3(2); *see also* Me. Rev. Stat. tit. 21-A, §§ 601(2)(B), (D), (J), 723-A(4)(A) ("The number of allowable rankings may be limited to no fewer than 5.").

73. If a candidate receives a majority of votes in the first round, she is declared the winner. *See* 29-250-535 Me. Code R. § 4(2)(A) (applying ranked-choice voting rules "[i]f no candidate receives more than 50% of the first choice votes"); *see also* Me. Rev. Stat. tit. 21-A, § 723-A(2)(A).

74. If no candidate receives a majority of the votes, then "the last-place candidate is defeated," and the vote moves to a new "round." Me. Rev. Stat. tit. 21-A, § 723-A(2)(B); *see also* 29-250-535 Me. Code R. § 4(2)(A).

75. More than one candidate may be eliminated per round if it is "mathematically impossible [for them] to be elected." Me. Rev. Stat. tit. 21-A, §§ 723-A(1)(A), (4)(B); *see also* 29-250-535 Me. Code R. §§ 4(2)(A), (B)(7).

76. The process is repeated in each subsequent round with the remaining "continuing candidates." *See* Me. Rev. Stat. tit. 21-A, § 723-A(2); *see also* 29-250-535 Me. Code R. §§ 4(2)(A), (B)(7).

77. Election officials "exhaust" and do "not count[]" ballots on which a voter did not rank a

continuing candidate.  *See* Me. Rev. Stat. tit. 21-A, §§ 723-A(1)(D), (2).

78. Anyone who fails to mark enough candidates is at risk of having his ballot "exhausted" and his vote "not counted" in the election round that "determine[s] the winner." Me. Rev. Stat. tit. 21-A, § 723-A(2).

79. There is no pre- or post-deprivation procedure by which a voter is informed that his or her ballot has been exhausted and given an opportunity to cure his ballot, nor is there any procedure by which he or she may challenge an exhaustion decision.

80. The winner is the candidate that wins a majority of votes in a round or receives the most votes "[i]n the final round, when only 2 continuing candidates remain[.]" 29-250-535 Me. Code R. § 4(2)(A); *see also* Me. Rev. Stat. tit. 21-A, §§ 723-A(2).

81. Maine adopted ranked-choice voting with the promise that it would, *inter alia*, "ensure[] that candidates with the most votes and broadest support win" and ensure that voters' "voice[s] matter[] more[.]"  *Frequently Asked Questions*, The Committee for Ranked Choice Voting, http://www.rcvmaine.com/faq (last visited July 13, 2020).

82. As explained below, these promises have turned out to be illusory.

### <u>THE RCV ACT HAS PREVENTED THE MAJORITY OF MAINE VOTERS FROM FULLY PARTICIPATING AND HAS DISENFRANCHISED MANY VOTERS</u>

83. There are two key metrics on which to measure the voter burden caused by the RCV Act: (i) the number of voters that fully participated, and (ii) the number of exhausted ballots.

84. Ranked-choice voting in Maine has led to an abysmally *low* rate of full voter participation and an equally abysmal *high* rate of ballot exhaustion—neither of which can be explained by voter choice.

*The RCV Act Has Prevented Many Maine Voters From Fully Participating In Federal Elections and Primary Elections*

85. *Hundreds of thousands* of ballots did not reflect full voter participation in Maine's 2018

ranked-choice elections.

86. To participate fully in an election, voters must complete their ballot in such a manner that they are not at risk of having their ballot exhausted before the final tally. Ex. A (Expert Report of Nolan McCarty, Ph.D., Professor of Politics and Public Affairs at Princeton University ("McCarty Report")), at 10.

87. Conversely, voters that fail to fully participate run the risk that their ballot will not be counted in determining the winner of a ranked-choice election in the final round of voting. *See id.*

88. There is no strategic reason for a voter to not fully participate in a ranked-choice election. *Id.* at 11.

89. In a ranked-choice election, a fully participating voter is a voter who ranks at least $n$-1 distinct candidates in an $n$-candidate election and does not overvote at any of the ranks. *Id.* at 10.

90. Ballots that fail to reflect full participation are referred to as "truncated ballots." *Id.*

91. The full participation rate is an important metric because the number of exhausted ballots tends to underestimate the full burden on voters for four reasons.

92. *First*, voters that do not fully participate run the risk of not having their vote counted in the outcome-determinative round of voting. Even if a truncated ballot happens to rank one of the final two continuing candidates, such an outcome masks the very real risk of disenfranchisement incurred by the voter. *Id.*

93. *Second*, a voter's ballot may not be exhausted even though the voter filled his or her ballot out in a way that is both irrational and inconsistent with an intentional protest vote—such as ranking a non-first-choice candidate in the second and fourth rounds of voting and a different, non-first-choice candidate in the third round. *Id.* at 11–12. These kinds of votes may not be discarded, but they demonstrate that voters failed to meaningfully understand and engage with the system.

*Id.*

94. ***Third***, the full participation rate better reflects voters who were burdened because they were required to make granular decisions concerning each and every candidate who appeared on the ballot—significantly more work than is required in a traditional plurality or runoff election. The data strongly supports the existence of this burden, as the ballot exhaustion rate increases by approximately 1.3% for every additional candidate in a ranked-choice election, suggesting that voters struggle to form complex preferences about larger slates of candidates. *Id.* at 9. Looking at only exhausted ballots does not fully capture the extent to which voters fail to complete their ballots because of this burden.

95. ***Fourth***, merely analyzing exhausted ballots fails to capture the burden on voters who placed their franchise at risk because they refused to speak in favor of and associate with candidates of which they disapprove. For example, Plaintiff Duane R. Lander plans to vote for only Susan Collins in the 2020 Senatorial Election because, *inter alia*, he does not wish to support other candidates who violate his political convictions. Lander Declaration ¶¶ 14–17. While his vote may not be exhausted—if Susan Collins remains a "continuing candidate" through to the final round—his lack of full participation will show that he incurred a very real burden: having to choose between (i) association with candidates he would rather not support in hypothetical matchups that may never occur, and (ii) the risk of not having his vote counted. *Id.*; *see also* Hagopian Declaration ¶¶ 9–20; Trudel Declaration ¶¶ 9–20.

96. Looking at the rate of full participation thus better shows the true extent of the RCV Act's burden on Mainers' fundamental right to vote.

97. In 2018, Maine held three elections using ranked-choice voting where a winner was not determined in the first round: (i) the 2018 general election for Maine's Second Congressional

District (the "2018 Congressional Election"), (ii) the 2018 Democratic primary for Maine's Second Congressional District (the "2018 Congressional Primary"), and (iii) the 2018 Democratic primary for Maine's Governor (the "2018 Gubernatorial Primary"). *See Tabulations for Elections held in 2018*, Maine.gov, https://www.maine.gov/sos/cec/elec/results/results18.html#Nov6 (last visited July 10, 2020).

98. In the 2018 Congressional Election, only ***38%*** of voters cast a fully participating ballot. McCarty Report at 15–16.  Nearly two thirds—***184,276 voters***—failed to successfully complete their ballot.  *Id.* at 12–13.

99. In the 2018 Gubernatorial Primary, only ***35%*** of voters cast a fully participating ballot. McCarty Report at 15–16.  More than two thirds—***86,166 voters***—failed to successfully complete their ballot.  *Id.* at 12–13.

100. In the 2018 Congressional Primary, only ***47%*** of voters cast a fully participating ballot. McCarty Report at 15–16.  More than half—***26,715 voters***—failed to successfully complete their ballot.  *Id.* at 12–13.

101. In other words, ***most*** Maine voters that show up to vote at ranked-choice elections fail to fully complete their ballot.

102. This burden on full participation is disproportionately borne by older voters and less educated voters.

103. Analysis of town-level voting data in Maine shows a substantial empirical relationship between the proportion of truncated or exhausted ballots and the percentage of voters on the voter rolls older than 65.  *Id.* at 16–21.

104. As a concrete example, "the town with the most senior voters truncates ballots at an almost 9 percentage greater rate than the town with the least senior voters."  *Id.* at 19.

105. These disparate results show that the statute has the effect of furthering discrimination on account of age.

106. Analysis of town-level voting data in Maine also shows a substantial empirical relationship between the proportion of truncated or exhausted ballots and the percentage of voters without a college degree.  *Id*. at 16–21.

107. These numbers show that "the least-educated town truncates ballots at a 14 percentage point greater rate than the most-educated town." *Id.* at 19.

108. These disparate results show that the statute has the effect of furthering discrimination on account of educational attainment.

109. In sum, the RCV Act results in a ***significant majority*** of Maine voters failing to fully participate in federal and primary elections—a statistic that is driven by elderly voters and voters without a college degree.

*The RCV Act Has Disenfranchised Many Maine Voters*

110. The Maine RCV Act has disenfranchised ***tens of thousands*** of voters.

111. The 2018 Congressional Election was decided on the second round of voting and featured 14,706 uncounted ballots—more than 10% of all ballots cast.  *Id.* at 12–13.  More than 8,000 of these ballots were exhausted after the first round of voting—meaning that voters marked a valid choice in the first round but no others.  *Id*.

112. In the 2018 Congressional Election, Bruce Poliquin (R) won a plurality of votes in the first round and led his second-place opponent, Jared F. Golden (D), by more than 2,000 votes at the completion of tabulation for that round.  *See Tabulations for Elections held in 2018*, Maine.gov, https://www.maine.gov/sos/cec/elec/results/results18.html#Nov6 (last visited July 10, 2020) (hyperlink to "Representative to Congress - District 2 - Results Certified to the Governor

11/26/18").

113. In the second round, the Secretary "transferred" more than 10,000 votes to Golden. These ballots were originally cast for the third or fourth place finishers but had ranked Golden for a later round. *Id.*

114. The Secretary exhausted approximately 8,000 additional ballots that were originally cast for the third or fourth place finishers but had not validly ranked Golden or Poliquin for the subsequent rounds. *Id.*; *see also* McCarty Report at 12–13.

115. In the second round, Golden was awarded 142,440 votes (50.62%), compared to Poliquin's 138,931 votes (49.38%). That 3,509-vote margin was magnitudes smaller than the 14,706 votes that were not counted and thus removed from the denominator in calculating the second-round "majority."

116. The 2018 Congressional Primary was also decided on the second round of voting. That race featured 7,381 uncounted ballots—nearly 15% of all ballots cast. McCarty Report at 12–13. Nearly 2,000 of these ballots were exhausted after the first round of voting. *Id.*

117. The 2018 Gubernatorial Primary was decided on the fourth round of voting. That race featured 15,000 uncounted ballots—more than 10% of all ballots cast. *Id.* More than 8,000 of these ballots were exhausted after the first round of voting. *Id.*

118. In sum, Maine has cumulatively "not counted" ***more than 40,000 ballots*** in ranked-choice rounds that have "determine[d] the winner" of federal and primary elections. Me. Rev. Stat. tit. 21-A, § 723-A(2).

### *Maine's Results Are Consistent With The Experience Of Ranked-Choice Voting In Other Jurisdictions And Are Unlikely To Improve Over Time*

119. Maine's abysmal rates of full voter participation and ballot exhaustion are typical for ranked-choice voting systems.

120. Failure to achieve full participation is "very common" in ranked-choice elections. McCarty Report at 10.

121. Truncated ballots in ranked-choice elections often have the potential to alter election outcomes and make it less likely that the candidate preferred by most voters ultimately wins the election. *Id.*

122. In addition, "high numbers of exhausted ballots are a pervasive phenomenon in RCV elections." *Id.* at 5.

123. In 98 ranked-choice elections in the United States that occurred between 2006 and 2019, on average, "10.8% of votes cast in an RCV election are considered exhausted," and "a large number of elections had ballot exhaustion rates of 20% and higher." *Id.* at 6.[1] By contrast, in Maine's plurality elections, the average proportion of ballots not counted is below 3%. *Id.* at 13.[2]

124. In RCV elections generally, the rate of ballot exhaustion increases with the number of candidates. *Id.* at 6–9.

125. The evidence demonstrates that these problems are "persistent, as rates of exhaustion do not decline over time." *Id.* at 2, 7–9.

126. Accordingly, the negative impacts on voter participation and exhausted ballots in Maine cannot be chalked up to a learning curve.

127. These empirical findings support the obvious: ranked-choice voting presents a serious challenge to voters effectively expressing themselves at the ballot box.

---

[1] "Exhaustion," for purposes of these calculations, does not include the number of ballots that are eliminated in the first round of voting—for example, ballots that were left completely blank. McCarty Report at 5, 6 n.8. Accordingly, this figure *underestimates* the number of votes that are not counted in ranked-choice elections.
[2] This figure comes from the 97.3% full participation rate in plurality elections. McCarty Report at 13.

## MAINE'S ABYSMAL FULL PARTICIPATION AND BALLOT EXHAUSTION FIGURES CANNOT BE EXPLAINED BY VOTER CHOICE

128. Maine's high numbers of voters who failed to fully participate and exhausted ballots are not the result of voters who knowingly chose to put themselves at risk of disenfranchisement. McCarty Report at 21–22.

129. *First*, the rate of full participation is significantly lower in ranked-choice voting elections than in traditional plurality and runoff elections.  McCarty Report at 13–16.

130. If the rate of full participation in ranked-choice voting was merely a function of voter choice, one would expect that a similar number of voters would fail to complete their ballots in plurality and traditional runoff elections.  But the data reveal that this is plainly not what is happening.

131. "Nearly every state" employs a plurality vote system.  *See Alternative Voting Systems*, National Conference of State Legislatures (June 25, 2020), https://www.ncsl.org/research/elections-and-campaigns/alternative-voting-systems.aspx.

132. In plurality voting, "voters select one candidate per race on a ballot and the candidate that receives the most votes wins."  *Id.*

133. Some states require a candidate to obtain a majority of votes to win.  *See* Katharina Owens Hubler & Wendy Underhill, *Primary Runoff Elections*, 25 Nat'l Conference of State Legislatures (Aug. 2017), https://www.ncsl.org/research/elections-and-campaigns/primary-runoff-elections.aspx.

134. These states hold a "runoff election" if no candidate receives greater than 50% of the votes.  *See id.*

135. Runoff elections are most common in primary elections, "where it is common to have a handful of candidates."  *See id.*

136. Despite the differences in these two systems, they both boast a relatively high full voter participation rate.

137. Recall that a fully participating voter is one who marks his ballot so that it is guaranteed to be counted in the final, determinative round.  In a plurality election, full voter participation is achieved by casting one ballot for the race in question.

138. In Maine, the average rate of full participation rate in contested plurality elections is 97.3%.  McCarty Report at 13.

139. In runoff elections, full participation is achieved when a voter casts one ballot in the initial election, and one ballot in the runoff election.  *Id.* at 15.

140. Maine does not use runoff elections.  In jurisdictions that do use runoff elections, the average rate of full voter participation ranges from 56% to 91%.  *Id.* at 15–16.

141. In ranked-choice voting elections, full participation is achieved when a voter ranks at least *n*-1 distinct candidates—where *n* is the number of candidates—and does not overvote any of the ranks.  *Id.* at 10.

142. In the 2018 Congressional Election, the rate of full voter participation was ***38%***.  *Id.* at 15–16.

143. In the 2018 Gubernatorial Primary, the rate of full voter participation was ***35%***.  *Id.*

144. In the 2018 Congressional Primary, the rate of full voter participation was ***47%***.  *Id.*

145. The story is the same for ballot exhaustion.

146. The average rate of ballot exhaustion in ranked-choice elections is 10.8%—though variables like the number of candidates often drive the rate higher than 20%.  *Id.* at 6.

147. In plurality races in Maine, ***less than 3%*** of ballots are discarded such that they do not count toward the final result.  *Id.* at 13.

148. Ranked-choice voting results in a significant *decrease* in full voter participation and a significant *increase* in exhausted ballots when compared to plurality elections and traditional runoff elections. *Id.* at 13–16.

149. *Second*, lack of full participation falls disproportionately on older and less educated voters. *Id.* at 16–21.

150. The data show that towns with higher shares of voters over the age of 65 and voters that do not have a college education generate lower rates of full participation. *Id.*

151. There is no reason to think that these voters are more likely than others to make an intentional choice to put their ballots at risk of exhaustion.

152. Rather, this finding supports the conclusion that a large number of voters are not fully participating because they do not understand ranked-choice voting and/or it is otherwise burdensome. *Id.* at 21–22.

153. *Third*, at least *17,352* voters cast ballots in a way that is fundamentally inconsistent with an informed choice to place themselves at risk of disenfranchisement. *Id.* at 11–12. These voters' ballots "defy any clear strategic or logical reason" and "cannot be attributed to voter choice." *Id.*

154. As a concrete example, nearly 2,000 voters ranked the same candidate in non-consecutive rounds of the 2018 Congressional Election. *Id.* at 12. A voter would meet this criterion if, for example, she voted for Bruce Poliquin in the first rank, Jared Golden in the second rank, and Bruce Poliquin again in the third rank. *Id.*

155. Unlike, for example, voters who rank only a single candidate—which *could* conceivably be interpreted as a protest vote[3]—these types of voting patterns reflect a fundamental

---

[3] The other evidence highlighted in this section and the experiences of Plaintiffs Duane R. Lander and Sterling B. Robinson, however, show that there are almost certainly a significant number of voters that voted in this way because they did not understand the system. *See* Lander Declaration ¶¶ 8–17; Robinson Declaration ¶¶ 9–14.

misunderstanding of ranked-choice voting.

156. **Fourth**, Plaintiffs' experience shows that many voters do not fully participate because they do not understand the mechanics of ranked-choice voting.

157. Plaintiffs Sterling B. Robinson and Duane R. Lander attested that they did not fully participate in the 2018 Congressional Election because they did not understand the mechanics of ranked-choice voting.  Lander Declaration ¶¶ 8–12; Robinson Declaration ¶¶ 9–14.

158. Mr. Sterling and Mr. Lander did not "choose" to put themselves at risk of not having their respective ballots counted.  *Id.*

159. Mr. Sterling and Mr. Lander are also worried about voting in the 2020 Senatorial Election because—even after participating in the 2018 Congressional Election and after attempts to better understand ranked-choice voting—they are still worried that they do not fully understand how the RCV Act works and may spoil or truncate their ballot, or effectuate a result they do not intend. Lander Declaration ¶¶ 12, 16–17; Robinson Declaration ¶¶ 18–19.

## EVEN VOTERS WHO FULLY PARTICIPATE ARE BURDENED BY RCV

160. Many voters are burdened even when they fully participate in a ranked-choice election because they are compelled to express support for and associate with candidates who violate their political convictions, as a condition of having their vote counted.

161. In ranked-choice voting, unlike virtually every other election system, voters are required to cast votes for the entire slate of candidates appearing on the ballot if they want to ensure that their vote is counted.

162. In effect, voters are put to a Hobson's Choice:  (i) express support for and associate with only candidates who they truly believe in—and risk disenfranchisement, or (ii) express support for and associate with candidates whom violate their political convictions—and ensure their vote is

counted.

163. For example, Plaintiffs Robert Hagopian and James T. Trudel ranked every candidate in the 2018 Congressional Election even though they supported only Bruce Poliquin.   Hagopian Declaration ¶¶ 8–15; Trudel Declaration ¶¶ 8–15.

164. Mr. Hagopian and Mr. Trudel would not have voted for the other candidates but for their (correct) fear that their ballots would have been at risk of not being counted if they failed to rank the entire slate of candidates who appeared on the ballot. *Id.*

165. Mr. Hagopian and Mr. Trudel were thus compelled to express support for and associate with candidates with whom they would have preferred to not express support or associate.

166. While the ballots of voters like Mr. Hagopian and Mr. Trudel are counted, these voters are burdened.

## THE 2020 GENERAL ELECTION

167. Maine voters will elect one member to the U.S. Senate in the general election on November 3, 2020, and two members to the U.S. House of Representative in the general election held that same day.

168. The primary elections held on July 14, 2020, identified the party candidates who will advance to the general elections.

169. The deadline for non-party candidates to submit petitions to appear on the ballot in Maine's 2020 general election was July 1, 2020, pursuant to the Governor's extended deadline. *See* Me. Rev. Stat. tit. 21-A § 354(8-A); *see also* Me. Exec. Order No. 39 FY 19/20, § I.B.2 (Apr. 10, 2020).

170. Only party candidates are participating in the 2020 election for Maine's First and Second Congressional Districts.   These elections thus do not involve the issues raised in this Complaint.

171. The 2020 Senatorial Election will include Susan Collins (R), Sara Gideon (D), Max Linn (I), and Lisa Savage (I).[4]

172. This election will be conducted pursuant to the RCV Act.  The respective candidates will be listed on the ballot, and voters will be instructed to rank them in order of preference.

173. To achieve full participation in the 2020 Senatorial Election, voters will have to rank at least three distinct candidates and not overvote any of the ranks.  This is similar to the 2018 Congressional Election, where full participation required voters to rank at least three distinct candidates and not overvote any of the ranks.

174. The rate of full voter participation in the 2020 Senatorial Election is likely to be similar to the dismal rate of full participation in the 2018 Congressional Election.

175. The rate of ballot truncation and ballot spoliation may be even higher in the 2020 Senatorial Election due to the Covid-19 pandemic.

176. As a result of Covid-19, more voters are expected to vote by mail.

177. Unlike in-person voting, an individual who votes by mail does not have access to Maine's Accessible Voting System or local election officials whom he or she may ask for help.  *See* Sec'y of State, *Maine Voter Guide Part 2: Casting Your Ballot* (last visited July 9, 2020), https://www.maine.gov/sos/cec/elec/voter-info/videotranscript.html#part2.  Given the fact that the complexity of RCV is directly preventing many Mainers from fully participating, the lack of available assistance is likely to cause the 2020 full voter participation numbers to be even worse than the 2018 numbers.

---

[4] There is also a pending lawsuit that may result in another independent candidate—Tiffany Bond—being placed on the ballot.  *See generally Bond v. Dunlap et al.*, No. 1:20-cv-00216 (D. Me. filed June 19, 2020).

## PLAINTIFFS' RIGHT TO VOTE WILL BE UNCONSTITUTIONALLY BURDENED BY RANKED-CHOICE VOTING IN THE UPCOMING ELECTION

178. Plaintiff Robert Hagopian ranked Bruce Poliquin in the first round of the 2018 Congressional Election, followed by the independent candidates, followed by Jared Golden. Hagopian Declaration ¶ 9.

179. Mr. Hagopian completed his ballot in this manner to ensure that his vote was counted and to put additional candidates between his first choice, Bruce Poliquin, and his last choice, Jared Golden. *Id.* ¶ 10.

180. Bruce Poliquin was the only candidate Mr. Hagopian truly supported. *Id.* ¶ 11.

181. Mr. Hagopian did not wish to express support for the other candidates because they stood for principles that violated his political convictions. *Id.* ¶ 12.

182. However, Mr. Hagopian correctly understood that if Bruce Poliquin were eliminated, his ballot would be discarded if he did not vote in additional rounds. *Id.* ¶ 13.

183. Accordingly, Mr. Hagopian voted for candidates other than Bruce Poliquin to ensure that his ballot was counted and to prevent Jared Golden from being elected. *Id.* ¶ 14.

184. Were it not for ranked-choice voting, Mr. Hagopian would not have supported candidates other than Bruce Poliquin. *Id.* ¶ 15.

185. Mr. Hagopian plans to vote in the 2020 Senatorial Election. *Id.* ¶ 16.

186. Mr. Hagopian wants to ensure that his vote will be counted in the 2020 Senatorial Election. *Id.* ¶ 17.

187. In the 2020 Senatorial election, Mr. Hagopian plans to rank Susan Collins first, followed by the independent candidates, followed last by Sara Gideon. *Id.* ¶ 18.

188. Mr. Hagopian does not support Sara Gideon or the independent candidates. *Id.* ¶ 19.

189. However, Mr. Hagopian will rank those candidates on his ballot to ensure that it is

counted. *Id.*

190. Mr. Hagopian will have to violate his political convictions once again in order to ensure that his vote is counted. *Id.* ¶ 20.

191. Accordingly, Mr. Hagopian will once again be compelled to speak and associate as a condition of exercising his fundamental right to vote.

192. Mr. Hagopian's right to vote will be burdened by the RCV Act in the 2020 Senatorial Election.

193. Plaintiff Duane R. Lander ranked Bruce Poliquin in each round of voting in the 2018 Congressional Election. In other words, Mr. Lander filled in the "circle" for Poliquin four times. Lander Declaration ¶ 10.

194. Mr. Lander was confused about the way ranked-choice voting worked in the 2018 Congressional Election. *Id.* ¶ 9.

195. Mr. Lander also did not want to vote for any other candidate. *Id.* ¶ 10.

196. Mr. Lander was under the impression that he needed to fill in each circle with Bruce Poliquin to ensure that his vote was counted. *Id.* ¶ 11.

197. Mr. Lander believed that if he filled in only the first circle for Poliquin, his vote would not be counted. He knows that many people voted that way and was under the impression that their votes were not counted. *Id.* ¶ 11.

198. Mr. Lander did not understand how votes for other candidates would be counted. *Id.* ¶ 12.

199. Mr. Lander did not understand that Poliquin could receive the highest number of votes in the first round and lose in the second round. *Id.* ¶ 12.

200. Mr. Lander still does not understand how votes for other candidates could be recounted

as votes for the eventual winner, Jared Golden. *Id.*

201. The significance of a vote for another candidate was never explained to Mr. Lander prior to his vote. *Id.*

202. Since the 2018 Congressional Election, Mr. Lander has attempted to better understand ranked-choice voting. *Id.* ¶ 13.

203. Among other things, Mr. Lander has had multiple conversations with experts in ranked-choice voting. *Id.*

204. Mr. Lander plans to vote in the 2020 Senatorial Election. *Id.* ¶ 14.

205. Mr. Lander plans to rank Susan Collins in every round of his ballot in the 2020 Senatorial Election. *Id.* ¶¶ 15–16.

206. Mr. Lander is under the impression that he must fill in the "circle" for Susan Collins for each round in order to ensure that his vote is counted. *Id.* ¶ 16.

207. Mr. Lander also does not want to vote for Sara Gideon or any of the other independent candidates. *Id.* ¶ 17.

208. Mr. Lander does not want to risk having his ballot exhausted. *Id.* ¶ 17.

209. However, if Mr. Lander completes his ballot as planned, he will not fully participate in the election, and his ballot may be exhausted.

210. Mr. Lander's right to vote will be burdened by the RCV Act in the 2020 Senatorial Election.

211. Plaintiff Sterling B. Robinson ranked Bruce Poliquin in the first round of voting in the 2018 Congressional Election and did not rank any additional candidates. Robinson Declaration ¶ 10.

212. Mr. Robinson completed his ballot in this manner, because after researching the ranked-

choice voting options, he was under the mistaken impression that it was not necessary to fill out additional rounds of the ballot to ensure that his ballot would not be exhausted. *Id.* ¶ 11.

213. Mr. Robinson was confused regarding the actions necessary to ensure that his vote was counted in each round of ranked-choice voting. *Id.* ¶ 12.

214. Mr. Robinson did not understand the significance of ranking other candidates on the ballot in the 2018 Congressional Election. *Id.* ¶ 13.

215. In particular, Mr. Robinson did not understand that the failure to rank additional candidates risked having his ballot exhausted. *Id.*

216. Had Mr. Robinson understood the significance of ranking other candidates, Mr. Robinson would have ranked additional candidates in the 2018 Congressional Election. *Id.* ¶ 14.

217. Mr. Robinson plans to vote in the 2020 Senatorial Election. *Id.* ¶ 15.

218. In the 2020 Senatorial Election, Mr. Robinson plans to rank Susan Collins as his first choice and additional candidates to ensure that his ballot is fully counted. *Id.* ¶ 16.

219. Mr. Robinson's goal is to ensure that his vote is counted. *Id.* ¶ 17.

220. However, Mr. Robinson still does not understand how to rank the candidates to both ensure that his preferred candidate is in the best position to win and ensure that his ballot will not be exhausted. *Id.* ¶ 18.

221. Mr. Robinson does not know where or how to research strategic ranked-choice voting, and he is concerned that in attempting to ensure his ballot is counted, he could unknowingly undermine his voting interests. *Id.* ¶ 19.

222. Mr. Robinson's right to vote will be burdened by the RCV Act in the 2020 Senatorial Election.

223. Plaintiff James T. Trudel ranked Bruce Poliquin in the first round of the 2018

Congressional Election, followed by the independent candidates, followed by Jared Golden. Trudel Declaration ¶ 9.

224. Mr. Trudel completed his ballot in this manner to ensure that his vote was counted and to put additional candidates between his first choice, Bruce Poliquin, and my last choice, Jared Golden. *Id.* ¶ 10.

225. Bruce Poliquin was the only candidate Mr. Trudel truly supported. *Id.* ¶ 11.

226. Mr. Trudel did not wish to express support for the other candidates because they stood for principles that violated his political convictions. *Id.* ¶ 12.

227. Mr. Trudel correctly understood that if Bruce Poliquin were eliminated, his ballot would be discarded if he did not vote in additional rounds. *Id.* ¶ 13.

228. Accordingly, Mr. Trudel voted for candidates other than Bruce Poliquin to ensure that his ballot was counted and to prevent Jared Golden from being elected. *Id.* ¶ 14.

229. Were it not for ranked-choice voting, Mr. Trudel would not have supported candidates other than Bruce Poliquin. *Id.* ¶ 15.

230. Mr. Trudel plans to vote in the 2020 Senatorial Election. *Id.* ¶ 16.

231. In the 2020 Senatorial Election, Mr. Trudel wants to ensure that his vote will be counted. *Id.* ¶ 17.

232. Mr. Trudel therefore plans to rank Susan Collins first, followed by the independent candidates, followed last by Sara Gideon. *Id.* ¶ 18.

233. Mr. Trudel does not support Sara Gideon or the independent candidates. *Id.* ¶ 19.

234. However, Mr. Trudel will rank them on his ballot to ensure that it is counted. *Id.*

235. As a result, Mr. Trudel will have to violate his political convictions once again in order to ensure that his vote is counted. *Id.* ¶ 20.

236. Accordingly, Mr. Trudel will once again be compelled to speak and associate as a condition of exercising his fundamental right to vote.

237. Mr. Trudel's right to vote will be burdened by the RCV Act in the 2020 Senatorial Election.

## NO STATE INTEREST JUSTIFIES DENYING MAINERS THE RIGHT TO FULLY PARTICIPATE IN FEDERAL ELECTIONS

238. The RCV Act does not advance any legitimate governmental interest.

239. Maine does not have a legitimate interest in putting the majority of Maine voters at risk of disenfranchisement.

240. Maine does not have a legitimate interest in limiting a purported "spoiler effect" associated with plurality voting.

241. The RCV Act does not diminish the spoiler effect. Instead, it introduces new "spoiler effects" due to quirks in the ranked-choice voting system, like the "non-monotonicity" problem. McCarty Report at 26–27.

242. The RCV Act does not advance a purported interest in "nuanced" voter expression. To the contrary, the empirical evidence shows that the RCV Act actually increases the risk of disenfranchisement and forces voters to express views contrary to their beliefs. *Id.* at 5–16.

243. The RCV Act does not advance a purported interest in voter participation. It actually reduces the rate of full participation among voters and results in more ballots not being counted toward the final election result. *Id.* at 5–16, 23–25. In addition, there is no academic literature that has observed "a boost in turnout associated with switching to RCV from plurality voting," and several that have observed a decline in turnout. *Id.* at 23.

244. The RCV Act does not advance a purported interest in ensuring that the winning candidate achieves majority support. In the 2018 Congressional Election, Maine declared Jared Golden the

winner even though he received only 49.2% of ballots cast.  McCarty Report at 27.  And this is no anomaly:  *most* RCV elections that move past the first round result in victors that fail to garner a majority of votes cast.  McCarty Report at 27.

245. Plurality elections and majority runoff elections are less burdensome on Plaintiffs' rights.

246. There is no conceivable state interest that would justify the burden on Plaintiffs' constitutional rights.

## PREVIOUS FEDERAL LITIGATION INVOLVING THE EFFECTS OF RANKED-CHOICE VOTING ON MAINE VOTERS

247. In December 2018, a Court within this District declined to set aside the results of the 2018 Congressional Election.  In that case the Court concluded, among other things, that the plaintiffs "ha[d] not demonstrated that their votes received less weight" as a result of the RCV Act, *Baber v. Dunlap*, 376 F. Supp. 3d 125, 140–41 (D. Me. 2018), *appeal dismissed*, No. 18-2250, 2018 WL 8583796 (1st Cir. Dec. 28, 2018), or that any voters "were disenfranchised during tabulation because they cast invalid overvotes or undervotes," *id.* at 143.  *See also Baber v. Dunlap*, 349 F. Supp. 3d 68 (D. Me. 2018) (denying temporary restraining order).

248. The Plaintiffs in that case did not present the Court with evidence that nearly two thirds of Maine voters had been denied full participation in the 2018 Congressional Election and thus had been placed at risk of disenfranchisement.  Nor did they show, as Plaintiffs do here, that the average rate of full voter participation and the actual rate of disenfranchisement are much worse under the RCV Act than under other types of voting systems.  Finally, Plaintiffs in that case lacked the empirical demographic data demonstrating that the RCV Act disproportionally burdens the right to vote of older and less-educated Mainers.

## FIRST CLAIM FOR RELIEF
### (First and Fourteenth Amendments, as enforced by 42 U.S.C. § 1983 – UNDUE BURDEN ON THE RIGHT TO VOTE)
(On Behalf of All Plaintiffs)

249. Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

250. Under the *Anderson-Burdick* balancing test, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  This test employs a flexible, sliding scale that analyzes "severe" burdens on First and Fourteenth Amendment rights under "strict scrutiny," and lesser burdens under less exacting scrutiny.  *See Lyman v. Baker*, 954 F.3d 351, 376 & n.15 (1st Cir. 2020).

251. In addition, burdens that "threaten to work patent and fundamental unfairness" or "disenfranchise[]" voters "constitute a violation of due process." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74–75 (1st Cir. 2001).

252. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

253. The RCV Act denied Plaintiffs full participation in the 2018 Congressional Election and will deny them full participation in the 2020 Senatorial Election.

254. The average rate of full voter participation in contested plurality races in Maine is 97.3%. McCarty Report at 13.

255. The average rate of full voter participation in runoff elections is between 56% and 91%.

*Id.* at 15–16.

256. The rate of full voter participation in the 2018 Congressional Election was 38%.  *Id.*

257. The rate of full voter participation in the 2018 Gubernatorial Primary was 35%.  *Id.*

258. The rate of full participation in the 2018 Congressional Primary was 47%.  *Id.*

259. The reductions in full voter participation caused by the RCV Act severely burden Plaintiffs' First and Fourteenth Amendment rights by placing them and other Maine voters at risk of disenfranchisement even though they intend to show up at the polling place and cast valid votes.

260. Voters who do not achieve full participation are also denied the opportunity afforded other voters to transfer their vote to a continuing candidate after the first round of tabulation.

261. The RCV Act disenfranchises in every election enough voters as is necessary to manufacture a "majority."

262. The RCV Act's flaws amount to a severe burden on the fundamental right to vote.

263. The RCV Act severely burdens Plaintiffs' fundamental right to vote.

264. ***First***, there is substantial empirical evidence that voters are burdened because the RCV Act prescribes a system that is complicated and that voters do not fully understand.   McCarty Report at 22 ("Examining the data, it becomes clear that the complexity of the RCV system leads to voter confusion which prevents voters from fully participating.").

265. Indeed, Plaintiffs Duane R. Lander and Sterling B. Robinson were unable to successfully complete their ballot in the 2018 Congressional Election because they found it incomprehensible. Lander Declaration ¶¶ 8–12; Robinson Declaration ¶¶ 9–14.

266. Both have expressed uncertainty regarding ranked-choice voting in the 2020 Senatorial Election.  Lander Declaration ¶¶ 12, 16; Robinson Declaration ¶¶ 18–19.

267. ***Second***, some voters may not complete their ballots because they prefer one candidate

and conclude that it is too burdensome to research every additional candidate running for the same position, and to consider every possible hypothetical matchup.

268. Unlike traditional runoff elections—where the voter is given an opportunity to assess the remaining candidates' platforms in a discrete election with real stakes—ranked-choice voting requires voters to assess the relative strengths and weaknesses of every candidate and express opinions on hypothetical candidate matchups that may never occur.

269. Indeed, voters are less likely to complete their ballot as more candidates appear on the ballot, showing that lack of voter participation stems from this burden and/or voter confusion. McCarty Report at 6–9.

270. **Third**, other voters understand the RCV Act system perfectly and are willing to conduct burdensome research to become informed about hypothetical matchups, but are determined to exercise their constitutional right to associate with only their preferred candidate.

271. In the 2020 Senatorial Election, Mr. Lander intends to vote for only Republican Susan Collins because, *inter alia*, he does not want to cast a vote for Ms. Gideon or the independent candidates. Lander Declaration ¶ 17.

272. If Susan Collins does not continue to the next round, however, Mr. Lander's ballot will, under the statute, be "not counted," Me. Rev. Stat. tit. 21-A, §§ 723-A(1)(D), (2), and he will have been deprived of the right to vote.

273. Additionally, Plaintiffs Robert Hagopian and James T. Trudel—while they plan to rank every candidate and thus ensure their votes are counted—are burdened because they will complete their ballots under duress.

274. Mr. Hagopian and Mr. Trudel support only Susan Collins and are thus burdened by the State's imposition of a requirement for them to support and associate with candidates of whom

they do not approve as a condition of ensuring that their ballots are in fact counted.  Hagopian Declaration ¶¶ 16–20; Trudel Declaration ¶¶ 16–20.

275. These burdens on the right to vote are not hypothetical.  In the 2018 race for Maine's Second Congressional District, more than *180,000* votes were subject to this risk and more than *14,000* were, in fact, not counted.  McCarty Report at 12–13.

276. Moreover, if Plaintiffs' preferred candidates continue to the second round, Plaintiffs will not be permitted to change their votes.  Only voters who voted for an eliminated candidate in the first round and chose to associate with additional candidates will be allowed to change their vote in the next round.

277. Maine does not have a legitimate governmental interest that justifies the burden on Plaintiffs' fundamental right to vote.

278. The governmental interests Maine could assert are not furthered—and in fact are undermined—by ranked-choice voting.  Moreover, the RCV Act is not an appropriately tailored means of furthering any purported governmental interest.

279. Accordingly, the RCV Act unconstitutionally burdens Plaintiffs' rights under the First and Fourteenth Amendments.

## SECOND CLAIM FOR RELIEF
### (First and Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – COMPELLED SPEECH AND ASSOCIATION)
(On Behalf of All Plaintiffs)

280. Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

281. "[F]reedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'"  *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)) (collecting cases).

282. "[T]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (citation omitted).

283. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

284. The RCV Act conditions a government benefit on engaging in unwanted expressive conduct.

285. In particular, the RCV Act confers a benefit—a higher likelihood of affecting the outcome of an election—on voters ranking additional candidates on their ranked-choice ballot.

286. As a result, voters may rank candidates that they find objectionable solely to receive the benefit of ensuring that their ballot is counted in the final round of tabulation.

287. For example, Plaintiffs Robert Hagopian and James T. Trudel were compelled to express support for candidates in the 2018 Congressional Election who were contrary to their political convictions in violation of their speech and associational rights, solely to preserve their fundamental right to vote.  Hagopian Declaration ¶¶ 8–15; Trudel Declaration ¶¶ 8–15.

288. Mr. Hagopian and Mr. Trudel will likewise be compelled to vote in the same manner in the 2020 Senatorial Election.  Hagopian Declaration ¶¶ 16–20; Trudel Declaration ¶¶ 16–20.

289. Likewise, Plaintiff Sterling B. Robinson plans to rank candidates he does not support to ensure that his ballot is ultimately counted.  Robinson Declaration ¶ 16.

290. On the other hand, Duane R. Lander plans to vote for only Susan Collins in the 2020 Senatorial Election because, *inter alia*, he does not want to vote for the other candidates.  Lander Declaration ¶¶ 16–17.

291. Ranking candidates on a ranked-choice ballot is expressive conduct.

292. It is also expressive association.

293. Unlike virtually every other method of voting, many—if not most—of the candidates ranked by a voter will have no effect on the outcome of the election.

294. The RCV Act requires more speech and association from voters than is necessary to determine the outcome of an election, unlike traditional plurality or runoff elections.

295. Under the RCV Act, voters like Plaintiffs will be compelled to choose between (i) engaging in expressive conduct that violates their firmly held political convictions, or (ii) risking having their ballots discarded in the 2020 Senatorial Election.

296. The RCV Act thus unconstitutionally conditions Mainers' fundamental right to vote on engaging in unwanted expressive conduct.

### THIRD CLAIM FOR RELIEF
**(Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS)**
(On Behalf of All Plaintiffs)

297. Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

298. The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.

299. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

300. The RCV Act denies Plaintiffs' fundamental right to vote without due process.

301. The RCV Act will inhibit the ability of Plaintiffs and Maine voters writ large from achieving full participation in the 2020 Senatorial Election, thus placing them at risk of disenfranchisement.

302. The RCV Act will cause a substantial number of Maine voters—potentially including

Plaintiffs—to have their ballots exhausted before the final round of tabulation in the 2020 Senatorial Election.

303. The RCV Act does not provide Plaintiffs or other voters with notice or opportunity to cure a defective ballot before it is exhausted.

304. The RCV Act does not provide an appeal process to challenge an exhaustion decision.

305. The RCV Act thus violates the Fourteenth Amendment's Due Process Clause.

**FOURTH CLAIM FOR RELIEF**
**(Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – EQUAL PROTECTION)**
(On Behalf of All Plaintiffs)

306. Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

307. "[I]n statewide and in congressional elections, one person's vote must be counted equally with those of all other voters in a State[.]" *Reynolds v. Sims*, 377 U.S. 533, 560 (1964).

308. Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

309. For the reasons articulated herein, the RCV Act accords some votes more weight than others.

310. Accordingly, the RCV Act violates the Fourteenth Amendment's Equal Protection Clause.

**FIFTH CLAIM FOR RELIEF**
**(Twenty-Sixth Amendment, as enforced by 42 U.S.C. § 1983 – ABRIDGEMENT OF THE RIGHT TO VOTE BASED ON AGE)**
(On Behalf of All Plaintiffs)

311. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though set forth fully herein.

312. The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States,

who are eighteen years of age or older, to vote, shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend XXVI, § 1.

313. The RCV Act abridges the rights of older voters by preventing a substantial number of voters over the age of 65 from achieving full participation in the electoral process and by exhausting their ballots at higher rates.

314. Accordingly, the RCV Act violates the Twenty-Sixth Amendment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in its favor and against Defendants, as follows:

A.  Declare that the RCV Act violates Plaintiffs' rights and the United States Constitution;

B.  Preliminarily and permanently enjoin Defendants and any of their subordinates from enforcing the RCV Act;

C.  Order Defendants to count Plaintiffs' ballots in the 2020 Senatorial Election;

D.  Award Plaintiffs their allowable costs and attorney's fees pursuant to 42 U.S.C. § 1988 or any other basis in law, as appropriate;

E.  Grant such further and additional relief as this Court deems just and proper.

July 22, 2020                               By:   /s/ Fred W. Bopp III

Fred W. Bopp III
**BOPP & GUECIA**
298 Main Street
Yarmouth, ME 04096
Telephone: 207-846-6111
fbopp@boppguecia.com

Michael E. Toner*
Stephen J. Obermeier*
Brandis L. Zehr*
Jeremy J. Broggi*
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
Telephone: 202-719-7000
MToner@wiley.law
SObermeier@wiley.law
BZehr@wiley.law
JBroggi@wiley.law

*Counsel for Plaintiffs*

*\*Certifications for Admission Pro Hac Vice Forthcoming*