## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ROBERT HAGOPIAN, | |
| DUANE R. LANDER, | |
| STERLING B. ROBINSON, and | |
| JAMES T. TRUDEL | |
| *Plaintiffs*, | |
| v. | Civil Action No. _____ |
| MATTHEW DUNLAP, in his official capacity as Secretary of State of Maine, | |
| AARON FREY, in his official capacity as Attorney General of Maine, and | |
| JANET MILLS, in her official capacity as Governor of Maine, | |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................... ii

INTRODUCTION....................................................................................................... 1

BACKGROUND.......................................................................................................... 2

STANDARD OF REVIEW ......................................................................................... 5

ARGUMENT ............................................................................................................... 6

    I.     Plaintiffs Will Succeed On The Merits Of Their Constitutional Claims.............. 6

          A.     The RCV Act Violates Plaintiffs' Right To Vote..................................... 6

          B.     The RCV Act Violates Plaintiffs' Right Not To Speak.......................... 14

          C.     The RCV Act Violates Plaintiffs' Right To Due Process. ...................... 15

          D.     The RCV Act Violates Plaintiffs' Right To Equal Treatment................ 17

    II.    The Harm To Plaintiffs' Constitutional Rights Is Irreperable. ........................... 18

    III.   The Balance Of Equities Favors Plaintiffs.......................................................... 19

    IV.   The Public Interest Favors Plaintiffs. ................................................................. 20

CONCLUSION........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agency for International Development v. Alliance for Open Society International, Inc.*,
570 U.S. 205 (2013)................................................................................................ 14

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)...........................................................................................6, 10

*Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla*,
490 F.3d 1 (1st Cir. 2007)..................................................................................... 19

*Ayers-Schaffner v. DiStefano*,
37 F.3d 726 (1st Cir. 1994)..............................................................................11, 20

*Baber v. Dunlap*,
376 F. Supp. 3d 125 (D. Me. 2018).........................................................................1

*Barr v. American Association of Political Consultants, Inc.*,
591 U. S. ____ (2020)............................................................................................ 18

*Bond v. Dunlap*,
No. 1:20-cv-216-NT (D. Me. filed June 6, 2020)....................................................2

*Boston Correll v. Herring*,
212 F. Supp. 3d 584 (E.D. Va. 2016)................................................................... 15

*Burdick v. Takushi*,
504 U.S. 428 (1992)..................................................................................................6

*California Democratic Party v. Jones*,
530 U.S. 567 (2000)............................................................................................. 11

*Clingman v. Beaver*,
544 U.S. 581 (2005)............................................................................................. 12

*CVS Pharmacy, Inc. v. Lavin*,
951 F.3d 50 (1st Cir. 2020) ...................................................................................5

*Democratic Executive Committee of Florida. v. Lee*,
915 F.3d 1312 (11th Cir. 2019).........................................................................7, 9

*Democratic National Committee v. Hobbs*,
948 F.3d 989 (9th Cir. 2020)............................................................................... 11

*Doe v. Rowe,*
    156 F. Supp. 2d 35 (D. Me. 2001) ............................................................................16, 17

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) ......................................................................................................... 13

*Fish v. Schwab,*
    957 F.3d 1105 (10th Cir. 2020) ........................................................................................ 9

*Freeman v. Morris,*
    No. 11-cv-00452, 2011 WL 6139216 (D. Me. Dec. 9, 2011) ......................................... 20

*Gorman v. University of Rhode Island,*
    837 F.2d 7 (1st Cir. 1988) ............................................................................................... 16

*Gray v. Sanders,*
    372 U.S. 368 (1963) ...................................................................................................3, 6, 7

*In re Hickenlooper,*
    312 P.3d 153 (Co. 2013) .................................................................................................. 15

*Hoblock v. Albany County Board of Elections,*
    422 F.3d 77 (2d Cir. 2005) .............................................................................................. 19

*Hyde Park Partners, L.P. v. Connolly,*
    839 F.2d 837 (1st Cir. 1988) ........................................................................................... 20

*Igartua v. Obama,*
    842 F.3d 149 (1st Cir. 2016) ........................................................................................... 16

*Janus v. American Federation of State, County, & Municipal Employees,*
    *Council 31,*
    138 S. Ct. 2448 (2018) ..................................................................................................... 14

*John Doe No. 1 v. Reed,*
    561 U.S. 186 (2010) ......................................................................................................... 14

*League of Women Voters of Florida, Inc., v. Detzner,*
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ........................................................................... 18

*League of Women Voters of North Carolina v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) .....................................................................................10, 19

*Libertarian Party of New Hampshire. v. Gardner,*
    638 F.3d 6 (1st Cir. 2011) ................................................................................................. 6

*Lyman v. Baker,*
    954 F.3d 351 (1st Cir. 2020) .....................................................................................*passim*

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..........................................................................15, 16, 17

*Miller v. City of Cincinnati*,
    622 F.3d 524 (6th Cir. 2010)........................................................... 20

*Mullane v. Central Hanover Trust Co.*,
    339 U.S. 306 (1950)............................................................................ 16

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)............................................................................. 6

*Obama for America v. Husted*,
    697 F.3d 423 (6th Cir. 2012)..................................................9, 10, 19

*Opinion of the Justices*,
    162 A.3d 188 (Me. 2017).................................................2, 10, 17, 20

*Partnoy v. Shelley*,
    277 F. Supp. 2d 1064 (S.D. Cal. 2003) ............................................ 15

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)............................................................................... 20

*Reynolds v. Sims*,
    377 U.S. 533 (1964)........................................................................... 11

*Saucedo v. Gardner*,
    335 F. Supp. 3d 202 (D.N.H. 2018) .................................................. 16

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
    699 F.3d 1 (1st Cir. 2012)................................................................. 19

*Tashjian v. Republican Party of Connecticut*,
    479 U.S. 208 (1986)........................................................................... 14

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016)............................................................... 9

*Walgren v. Howes*,
    482 F.2d 95 (1st Cir. 1973).......................................................7, 9, 11, 18

*Wesberry v. Sanders*,
    376 U.S. 1 (1964)............................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................. 5

**Constitution**

U.S. Const. amend. I ................................................................................. 6, 14 ,15, 19

U.S. Const. amend. XIV ............................................................................... 15, 17

U.S. Const. amend. XXVI ................................................................................. 18

**Statutes**

Me. Rev. Stat. tit. 21-A, § 723-A ..................................................................... 2, 7

**Other**

Kristen Eberhard, *My Big, Bold Ranked-Choice Voting Proposal* (Feb. 1, 2018),
    https://www.sightline.org/2018/02/01/my-big-bold-ranked-choice-voting-
    proposal/ ....................................................................................................... 13

FairVote, *Correcting the Spoiler Effect* (last visited July 22, 2020),
    http://archive3.fairvote.org/reforms/instant-runoff-voting/irv-and-the-status-
    quo/spoiler-effect/ .......................................................................................... 12

Matt Gagnon et al., Maine Heritage Policy Center, *A False Majority: The Failed
    Experiment of Ranked-Choice Voting* 18 (Aug. 2019) ...................................... 12

Maine Committee on Ranked Choice Voting, *What are the benefits of voting with
    a ranked choice ballot?*,
    http://www.rcvmaine.com/what_are_the_benefits_of_voting_with_a_ranked_
    choice_ballot (last visited July 22, 2020) ........................................................ 13

Sec'y State, *Upcoming Elections*, Maine.gov,
    https://www.maine.gov/sos/cec/elec/upcoming/index.html (last visited July
    22, 2020) ......................................................................................................... 2

*Hans von Spakovsky et al., Ranked Choice Voting Is a Bad Choice*, The Heritage
    Foundation (Aug. 23, 2019), https://www.heritage.org/election-
    integrity/report/ranked-choice-voting-bad-choice .......................................... 13

## INTRODUCTION

This case seeks injunctive and declaratory relief to vindicate the constitutional rights of Plaintiffs and other Mainers who will soon be denied full participation in the federal election set for November 3, 2020 (the "2020 General Election"). That election will be conducted pursuant to Maine's Act to Establish Ranked-Choice Voting (the "RCV Act") and will place Plaintiffs and approximately one-half to two-thirds of other Mainers who choose to vote at serious risk of disenfranchisement unless this Court intervenes. That intervention is needed now as Plaintiffs understand that Maine intends to finalize the ballot for printing on or about August 28, 2020.

Significant empirical evidence of the widespread risk of voter disenfranchisement separates this case from prior challenges to the RCV Act. In particular, in December 2018, the Court declined to set aside the results of a general election race where the Court concluded that the plaintiffs "ha[d] not demonstrated that their votes received less weight" as a result of the RCV Act, *Baber v. Dunlap*, 376 F. Supp. 3d 125, 140–41 (D. Me. 2018), *appeal dismissed*, No. 18-2250, 2018 WL 8583796 (1st Cir. Dec. 28, 2018), or that any voters "were disenfranchised during tabulation because they cast invalid overvotes or undervotes," *id.* at 143.

The plaintiffs in that case did not present the Court with the empirical evidence here that nearly two thirds of Maine voters had been denied full participation and placed at risk of disenfranchisement. Nor did they show, as Plaintiffs also do here, that the average rate of full participation and the actual rate of disenfranchisement are much worse under the RCV Act than under other forms of voting. Finally, the plaintiffs in that case lacked the demographic data present in this case demonstrating that the RCV Act disproportionally burdens the right to vote of older and less educated Mainers.

The Court should now strike down the RCV Act to prevent substantial voter disenfranchisement in Maine's 2020 General Election and beyond.

## BACKGROUND

Mainers will elect their federal representatives this November. Because there will be four candidates in the race for the U.S. Senate—Susan Collins (R), Sara Gideon (D), Max Linn (I), and Lisa Savage (I)—"[r]anked-choice voting will be used." Sec'y State, *Upcoming Elections*, Maine.gov, https://www.maine.gov/sos/cec/elec/upcoming/index.html (last visited July 20, 2020).[1]

Ranked-choice voting permits voters to rank multiple candidates in order of choice. Under the RCV Act, if a single candidate receives a majority of first-choice votes, that candidate is declared the winner. *See* Me. Rev. Stat. tit. 21-A, § 723-A(2)(A). If no candidate receives a majority, then "the last-place candidate is defeated and a new round begins." *Id.* § 723-A(2)(B). In that new round, each "continuing ballot counts as one vote for its highest-ranked continuing candidate for that round." *Id.* §§ 723-A(1)(B), 723-A(2). Ballots "that do[ ] not rank any continuing candidate, contain[ ] an overvote at the highest continuing ranking or contain[ ] 2 or more sequential skipped rankings before its highest continuing ranking" are deemed "[e]xhausted" and "are not counted." *Id.* §§ 723-A(1)(D), 723-A(2). The RCV Act requires these rounds to continue "until a majority is achieved or all votes are exhausted." *Opinion of the Justices*, 162 A.3d 188, 211 (Me. 2017). The RCV Act does not provide voters with notice or an opportunity to cure if their ballots are exhausted.

In 2018, Maine conducted its first elections under the RCV Act, and the results were abysmal. In the general election race for Maine's Second Congressional District (the "2018 Congressional Election"), the rate of full voter participation—that is, the percentage of voters

---

[1] These were the four candidates following the primary election held on July 14, 2020, and the extension of the deadline for non-party petitions to July 1, 2020. A potential fifth candidate is also seeking ballot access. *See Bond v. Dunlap*, 1:20-cv-216-NT (D. Me. filed June 6, 2020).

who completed their ballot in a manner that guaranteed it would be counted in the final tally—plunged from its recent pre-RCV Act average above 97% to just 37.7%. Expert Report of Nolan McCarty, Ph.D., Professor of Politics and Public Affairs at Princeton University ("McCarty Report"), at 11, 13. The full voter participation rates in the Democratic primary for Maine's Second Congressional District (the "2018 Congressional Primary") and the Democratic primary for Governor (the "2018 Gubernatorial Primary") were similarly dismal. *Id.* at 12. In each of these three elections (collectively, the "2018 Elections"), approximately one-half to two-thirds of Mainers who voted were at risk of having their votes discarded even though they had shown up at the polls and cast legal ballots.

The steep plunge in the rate of full voter participation evidences the severe burden the RCV Act imposes on Mainers' constitutional rights. In ranked-choice elections, full participation is achieved when a voter ranks at least $n$-1 distinct candidates—where $n$ is the number of candidates running—and does not overvote any ranks. The rate of full participation thus captures the percentage of voters whose votes are guaranteed to not be exhausted under the RCV Act and thus will be counted in the final, determinative round. That, of course, is the round that matters most for purposes of constitutional analysis, *see Gray v. Sanders*, 372 U.S. 368, 381 n.12 (1963) ("being counted only for the purpose of being discarded" is "worth nothing"), and therefore is most relevant for quantifying the burden on the fundamental right to vote.

The low percentage of fully participating voters cannot be attributed solely to voter choice. As an initial matter, the full voter participation numbers in Maine compare poorly to traditional plurality and runoff elections. As noted above, Maine's pre-RCV Act average rate of full participation in plurality elections was 97.3%. McCarty Report, at 13. And, although Maine does not employ runoff elections, other jurisdictions see average rates of full participation

3

between 56% and 91%.  *Id.* at 15 (Table 5).  The empirical data therefore clearly show that Maine ranked-choice elections have full voter participation rates far below the averages for the other types of elections.

Moreover, lack of full voter participation was most pronounced in Maine counties with higher numbers of older and less educated voters.  McCarty Report, at 16–21.  The data show that for every 10 percentage point increase in seniors as a share of a town's population, there is an increase in truncated ballots of 2.9 percentage points, exhausted ballots of .5 percentage points, and all undervoting of .9 percentage points.  *Id.* at 20.  Similarly, a 10 percentage point increase in the non-college population increases truncation by 3.6 percentage points, exhausted ballots by .4 percentage points, and all undervoting by .7 percentage points.  *Id.*[2]

In addition, the 2018 Congressional Election featured a wide variety of incorrect and even ineffective balloting.  For example, there were a significant number of ballots exhibiting odd voting patterns—such as skipping rounds—that are impossible to rationalize as strategic or expressive voter behavior.  McCarty Report, at 11–12 (Table 2).  These voters did not choose to risk ballot exhaustion—they were simply confused.

The decline in full participation under the RCV Act, as well as the disproportionate effect of the RCV Act on older and less educated voters, and the high number of ballots that lack any clear rational explanation, demonstrate that the low full participation rate in Maine cannot be explained by voter choice or expression alone but is due to problems inherent in ranked-choice elections.  McCarty Report, at 2.  The complexities of the system are causing voter confusion that is preventing many voters from fully participating.  *Id.*

Plaintiffs are among the Maine voters whose constitutional rights will be violated by the

---

[2]  In these figures, "exhausted ballots" refer to ballots that were not counted after the first round. "All undervoting" counts these exhausted ballots and ballots left blank in the first round.

RCV Act in the 2020 General Election if this Court does not intervene. Plaintiffs intend to vote in that election and want to guarantee that their ballots are counted regardless of what unfolds. Some are concerned, however, that the complexity of the RCV ballot will put them at risk of disenfranchisement or of helping to effectuate election results they do not intend.

In addition, the threat of ballot exhaustion compels some Plaintiffs to rank more candidates than they otherwise would. For these Plaintiffs, the act of ranking additional candidates forces them to form and express nuanced opinions about the relative merits of candidates for whom they would not vote absent the threat of disenfranchisement. For others, the threat of disenfranchisement forces them to rank candidates they find objectionable in order to ensure that their ballots are counted in the final result, thus putting these voters to a Hobson's Choice: associate with candidates who they disapprove of, or risk losing the fundamental right to have their votes counted.

## STANDARD OF REVIEW

This Court must consider four factors in assessing whether to grant a preliminary injunction: (1) "the movant's likelihood of success on the merits," (2) "whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief," (3) "the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues," and (4) "the effect, if any, that an injunction or the lack of one may have on the public interest." *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020) (brackets and quotation marks omitted); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because all four factors favor Plaintiffs, they are entitled to preliminary relief.

**ARGUMENT**

I.   **PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.**

A.   **The RCV Act Violates Plaintiffs' Right To Vote.**

Plaintiffs will succeed on the merits because the RCV Act imposes severe burdens on their right to vote that cannot be justified by Maine's governmental interests.  The First and Fourteenth Amendments guarantee "[t]he freedom of association." *Lyman v. Baker*, 954 F.3d 351, 376 (1st Cir. 2020) (citation omitted); *see NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").  Associational freedom, in turn, encompasses the fundamental right of citizens to "express their preferences at the ballot box," *Lyman*, 954 F.3d at 376, and "to have [their] vote counted," *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (citation omitted).

This Court reviews burdens on the right to vote "under the sliding scale approach announced by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)." *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011).  Under that test, if a regulation "severely burdens a plaintiff's associational rights" this Court must apply "strict scrutiny," meaning that the regulation "must be 'narrowly tailored and advance a compelling state interest.'" *Lyman*, 954 F.3d at 376 (citation omitted).  "By contrast, lesser burdens trigger less exacting review." *Id.* (cleaned up).  In either case, the Court "must weigh 'the character and magnitude of the asserted injury' . . . against 'the precise interests put forward by the State' . . . taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting

*Anderson*, 460 U.S. at 789).  Because the RCV Act severely burdens Plaintiffs' right to vote without advancing any governmental interest, it fails under any standard of review.

1.    Strict Scrutiny Applies Because The RCV Act Places A Severe Burden On Plaintiffs' Right To Vote.

The RCV Act requires Plaintiffs to "rank" enough candidates on the ballot to ensure that theirs is a "continuing ballot" that survives and is counted in the determinative "final round." Me. Rev. Stat. tit. 21-A, §§ 723-A(1)(B), (D), 723-A(3).  Anyone who fails to mark enough candidates is at risk of having his ballot "[e]xhausted" and his vote "not counted" in the election round that "determine[s] the winner."  Me. Rev. Stat. tit. 21-A, § 723-A(2).  That risk burdens Plaintiffs' "right to have one's vote counted."  *Gray*, 372 U.S. at 380 (citation omitted); *see id.* at 381 n.12 ("being counted only for the purpose of being discarded" is "worth nothing").  And the empirical evidence shows that the burden is widespread and severe.

Foremost, the burden is "severe" because it "discourages and prevents full participation in the electoral process" by Maine voters.  *Walgren v. Howes*, 482 F.2d 95, 98–100 (1st Cir. 1973) (citation omitted); *see Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319–23 (11th Cir. 2019) (finding "serious burden" where "5 hundredths of a percent" of voters faced "risk of disenfranchisement").  Mainers share a proud democratic tradition.  Among Mainers who choose to vote, the average rate of full participation in plurality elections is above 97%. McCarty Report, at 13.  Full voter participation is critical to effective use of the franchise because it ensures that one's vote is counted in the final tally.  *Id.* at 10.  The high rate of full voter participation in plurality elections shows that the plurality standard enables Mainers "to cast an effective vote."  *Lyman*, 954 F.3d at 376 (citation omitted).

The opposite is true for ranked-choice voting.  In the 2018 Congressional Election—the only general election in Maine tabulated under the RCV Act to date—full voter participation

7

plunged to just 37.7%.  McCarty Report, at 11.  Full voter participation in the 2018 Congressional Primary and the 2018 Gubernatorial Primary was likewise very poor, standing at 47% and 35% respectively.  *Id.* at 12.  Put differently, in each of the only three elections that have been conducted under the RCV Act to date, one-half to two-thirds of Mainers who voted were placed at risk of disenfranchisement.

That is exactly what happened to Plaintiffs Sterling Robinson and Duane Lander.  Both men wanted to provide their full support to Bruce Poliquin in the 2018 General Election and to ensure that their votes were counted.  Neither was sure how best to effectuate that choice.  Mr. Robinson filled out only the first rank because "after researching the ranked-choice voting options" he "was under the mistaken impression that it was not necessary to fill out additional rounds of the ballot to ensure that my ballot would not be exhausted."  Robinson Declaration ¶ 11.  Mr. Lander "understood that if I only filled in the first circle for Poliquin, my vote would not be counted" and so filled in "each circle for Poliquin" on the mistaken belief that this would guarantee his vote would be counted in the final round.  Lander Declaration ¶ 11.

Both men now want to support Susan Collins in the 2020 General Election but remain uncertain about how best to express that preference and ensure that their votes are counted.  Mr. Lander has "had multiple conversations with experts in ranked-choice voting" and until the outset of this litigation continued to believe that his vote would be counted in every round if he "fill[ed] in the 'circle' for Susan Collins for each round."  Lander Declaration ¶¶ 13, 16.  Mr. Robinson, on the other hand, acknowledges that he does "not understand how to rank the candidates to both ensure that my preferred candidate is in the best position to win while ensuring that my ballot will not be exhausted."  Robinson Declaration ¶ 18.

Their voting experiences under the RCV Act are all too common.  The data show that the

low rate of full voter participation is a pervasive feature of ranked-choice voting not only in Maine, but across other jurisdictions.  McCarty Report, at 6.  It is also persistent.  The high frequency of ballot exhaustion reflected is as prevalent in jurisdictions that have used ranked-choice voting for decades as in jurisdictions that use it for the first time.  *Id.* at 2, 8–9.  Meanwhile, in traditional runoff elections—a system to which ranked-choice voting is often compared—the average rate of full participation is substantially higher even though voters must go to the polls twice to achieve full participation.  *Id.* at 15–16 (Table 5).  This too shows that burdens imposed by ranked-choice voting are severe.

The "risk of disenfranchisement" has been held to impose a "serious burden" when it affects as few as "5 hundredths of a percent" of voters in an election.  *Lee*, 915 F.3d at 1319–23; *see also Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020) (finding "significant" burden where "expert opined" that voting requirement would affect "thousand[s]"); *Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (applying heightened scrutiny where the "court credited statistical studies that estimated approximately 100,000 Ohio voters" would be affected by a reduced early voting period); *Veasey v. Abbott*, 830 F.3d 216, 250 (5th Cir. 2016) (finding "excessive" burden where "expert analysis and testimony by the individual Plaintiffs" showed effects on "4.5% of all registered voters").  The burden is thus undeniably severe where, as here, *it threatens a majority of voters*.

Indeed, the severity of the burden is compounded in this case because the empirical evidence shows that the effects of the RCV Act "bear demonstrably on a large and identifiable class of voters, to their disadvantage."  *Walgren*, 482 F.2d at 100; *see Husted*, 697 F.3d at 430 ("The Supreme Court [has] . . . connect[ed] its equal protection voting rights jurisprudence . . . with *Anderson* and *Burdick*[.]").  The analysis of county-level voting data in Maine prepared by

Professor McCarty reveals a strong empirical relationship between the proportion of truncated or exhausted ballots and the percentage of older and less educated voters on the voter rolls. Specifically, for every 10 percentage point increase in seniors there is an increase in truncated ballots of 2.9 percentage points, exhausted ballots of .5 percentage points, and all undervoting of .9 percentage points. McCarty Report, at 20. Similarly, a 10 percentage point increase in the non-college population increases truncation by 3.6 percentage points, exhausted ballots by .4 percentage points, and all undervoting by .7 percentage points. *Id.* Those empirical findings are relevant because Plaintiffs are all in their 70s and Mr. Robinson lacks a college degree. And courts have recognized that the burden on the right to vote is "particularly high" where, as here, the state regulation disproportionately harms voters who are "older" and of "lower . . . education attainment." *Husted*, 697 F.3d at 431 (citation omitted).

In addition, the burden imposed by the RCV Act is severe because it not only threatens disenfranchisement for a majority of Maine voters but in fact has actually disenfranchised thousands of voters in every election in which it has been employed. McCarty Report, at 12–13 (Table 3). It is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014). Yet that is exactly what the RCV Act is *designed* to do. Maine's Supreme Judicial Court has explained that the statute permits a candidate to obtain "a majority" through the transfer of ballots "*or because the ballots have been exhausted.*" *Opinion of the Justices*, 162 A.3d at 211 (emphasis added). In other words, the RCV Act manufactures "a majority" in part through the elimination of ballots that were validly cast in the first round. For these thousands of voters, the "total denial" of their "right to vote in the only [election] with any significance" is "undeniably severe." *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 728 (1st Cir. 1994).

2.      Plaintiffs Will Succeed Under Any Level Of Scrutiny.

Because the burdens imposed by the RCV Act are severe, it "must be 'narrowly tailored and advance a compelling state interest.'" *Lyman*, 954 F.3d at 376 (citation omitted).  Maine cannot satisfy rational basis review, let alone strict scrutiny.

To begin with, Maine does not have a legitimate governmental interest in putting two-thirds of its voters at risk of disenfranchisement.  "The right to vote is the foundation of our democracy," *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 997 (9th Cir. 2020), "[a]nd history has seen a continuing expansion of the scope of the right of suffrage in this country," *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  States have no legitimate interest, much less a compelling one, in adopting policies that discourage or impair the effective use of the franchise.

Nor does the RCV Act plausibly advance any governmental interest recognized by the courts.  The First Circuit has validated state interests in "minimizing" "voter confusion" and "accidental error." *Walgren*, 482 F.2d at 100.  So too policies that promote "the maximizing of voter participation." *Id.*  Assuming those interests have purchase here, *but see Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000) (explaining that the strength of a state interest is not assessed "in the abstract" but in light of the evidence and the particular aspect of the interest "addressed by the law at issue"), the RCV Act does not promote them.

Consider voter participation.  As already discussed, the empirical evidence from the 2018 Elections shows that ranked-choice voting diminishes the average rate of full participation among individual Maine voters.  Section I.A.1.  In addition, ranked-choice voting has been shown to decrease overall voter turnout and engagement both in Maine and elsewhere.  Professor McCarty found that Maine voters were no more attracted to voting in ranked-choice elections than under plurality elections on the same ballot.  McCarty Report, at 3.  And the debate in the academic literature regarding voter turnout concerns the *decline* associated with ranked-choice

11

voting—not a potential increase.  *Id.* at 23; *see also* Matt Gagnon et al., Maine Heritage Policy Center, *A False Majority: The Failed Experiment of Ranked-Choice Voting* 18 (Aug. 2019) ("The empirical evidence is mixed but tends to show that ranked-choice voting slightly depresses turnout relative to plurality elections.").  In short, the empirical evidence is that ranked-choice voting makes the unique problems associated with voter participation worse, not better.

The same is true for voter confusion and voter error.  In Maine and elsewhere, the number of truncated and exhausted ballots *increases* under ranked-choice voting.  *See* McCarty Report, at 5–9.  The wide variety of incorrect and even ineffective balloting demonstrates that it cannot be attributed to voter choice.  For example, in the 2018 Congressional Election, there were a significant number of ballots exhibiting odd voting patterns—such as skipping rounds— that are impossible to rationalize.  *Id.* at 11 (Table 2).  Indeed, in that election "voter confusion was so pervasive that proponents of ranked-choice voting felt the need to publish a 19-page instruction manual to help voters navigate the process."  Maine Heritage Policy Center, *A False Majority: The Failed Experiment of Ranked-Choice Voting* 7 (Aug. 2019).  Far from mitigating voter error, the RCV Act makes it worse.  And empirical evidence shows that these adverse effects are felt most strongly among populations of older and less educated Maine voters.

Nor does ranked-choice voting advance the other goals propounded by its advocates. Some have claimed that ranked-choice voting reduces the so-called "spoiler effect" from minor party and independent candidates.  *See, e.g.*, FairVote, *Correcting the Spoiler Effect* (last visited July 16, 2020), http://archive3.fairvote.org/reforms/instant-runoff-voting/irv-and-the-status-quo/spoiler-effect/.  Assuming that goal is even legitimate, *but see Clingman v. Beaver*, 544 U.S. 581, 609 (2005) (Stevens, J., dissenting) ("States do not have a valid interest in . . . protecting the major parties from competition"), ranked-choice voting does nothing to advance it.  The

empirical evidence shows that rather than eliminating the spoiler effect, ranked-choice voting merely creates new opportunities for abuse.  McCarty Report, at 26–27.

Some advocates of ranked-choice voting have also claimed that any difficulties it creates are desirable insofar as they promote "knowledgeable" voting.  *See, e.g.*, Kristen Eberhard, *My Big, Bold Ranked-Choice Voting Proposal* (Feb. 1, 2018), https://www.sightline.org/2018/02/01/my-big-bold-ranked-choice-voting-proposal/.  However, the Supreme Court has consistently rejected restrictions that are said to further "knowledgeable or intelligent" voting.  *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 356 (1972).  Thus, if anything, the purported benefit only helps to show the *unconstitutionality* of ranked-choice voting.

The same is true for the contention that ranked-choice voting promotes "majority rule." Me. Comm. Ranked Choice Voting, *What are the benefits of voting with a ranked choice ballot?*, http://www.rcvmaine.com/what_are_the_benefits_of_voting_with_a_ranked_choice_ballot (last visited July 16, 2020).  Record evidence shows that "[t]his claim is incorrect empirically" because these so-called majorities are achieved through ballot exhaustion, *i.e.*, not counting thousands of votes.  McCarty Report, at 27.

Even if the RCV Act did serve some legitimate state interest, it is not appropriately tailored.  Most of the purported purposes of ranked-choice voting would be served by a majority runoff requirement.  *See, e.g.*, Hans von Spakovsky et al., *Ranked Choice Voting Is a Bad Choice*, The Heritage Foundation (Aug. 23, 2019), https://www.heritage.org/election-integrity/report/ranked-choice-voting-bad-choice.  Others could be served by a plurality election. That these methods would be significantly less burdensome on the fundamental right to vote is evidenced by their much higher rates of full participation—even though, in the case of runoffs, voters must show up twice at the polls to achieve full participation.  McCarty Report, at 14–15.

In sum, Plaintiffs will succeed on the merits because the RCV Act imposes a severe burden on their right to vote and, despite its unnecessarily broad sweep, fails to advance the governmental interests it purportedly serves.

**B.      The RCV Act Violates Plaintiffs' Right Not To Speak.**

Plaintiffs will also succeed on the merits because the RCV Act conditions their right of full voter participation in the 2020 General Election on compelled speech and association.  The "freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018) (quotation marks omitted).  "The right to eschew association for expressive purposes is likewise protected." *Id.*   These principles apply to voting because it involves "political association," *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 211 (1986), and "expression," *John Doe No. 1 v. Reed*, 561 U.S. 186, 194–95 (2010).

The RCV Act conditions the right to vote on compelled speech and expression because, as explained in section I.A.1., the only way for voters to guarantee that their ballot will be counted in the final round is to rank every candidate in that race except for one.  For Robert Hagopian and James Trudel, that threat of ballot exhaustion compels them to "express support" for candidates they find objectionable.  Hagopian Declaration ¶ 12; Trudel Declaration ¶ 12; *see also* Robinson Declaration ¶ 16 ("I will be voting for Susan Collins as in the first round, but I intend to rank the other Senate candidates in the remaining rounds to ensure that my ballot is fully counted.").  Putting voters to that choice is unconstitutional because "[t]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

Not surprisingly, numerous courts have found election systems unconstitutional where they "compel[ ] voters" to express themselves on issues "where they may have no opinion" or to

make choices they "categorically oppose" as a condition of having their vote counted.  *In re Hickenlooper*, 312 P.3d 153, 158 (Co. 2013); *see, e.g.*, *Partnoy v. Shelley*, 277 F. Supp. 2d 1064, 1078 (S.D. Cal. 2003) (holding election procedure unconstitutional that "force[d] [voters] to take a position on the question of recall, of which the failure to do so results in the cancellation of their vote").  Those same principles apply in this case because the RCV Act requires more speech from voters than would be necessary to determine the outcome of the election under either a plurality or a majority runoff system, and thus is not narrowly tailored.  It is not hard to imagine a situation in which two or more candidates deeply offend voters' sincerely held beliefs, thereby compelling voters to express support on their ballot.  And Maine cannot evade these fundamental First Amendment limitations by recasting them as requirements for full voter participation in its elections.  *See Bos. Correll v. Herring*, 212 F. Supp. 3d 584, 605 (E.D. Va. 2016) (rejecting justification that, "if accepted, would allow the Commonwealth to accomplish indirectly (by attachment of an unconstitutional limitation to dictate convention voting) that which the Commonwealth cannot do directly (regulate convention voting).").

For these reasons, the RCV Act violates Plaintiffs' right not to speak.

## C.    The RCV Act Violates Plaintiffs' Right To Due Process.

Plaintiffs will also succeed on the merits because the RCV Act denies them due process.  The Fourteenth Amendment prohibits Maine from depriving "any person of . . . liberty . . . without due process of law."  U.S. Const. amend. XIV, § 1.  Because the right to vote "is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment," *Lyman*, 954 F.3d at 376 (quoting *NAACP*, 357 U.S. at 460), Plaintiffs are entitled to "constitutionally sufficient" process, *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

The tripartite *Mathews* framework exposes Maine's denial of due process.  *First*, there can be no dispute that Plaintiffs' "private interests" are of the highest magnitude.  *Mathews*, 424

U.S. at 334. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *accord Igartua v. Obama*, 842 F.3d 149, 159 (1st Cir. 2016).

*Second*, the RCV Act subjects Plaintiffs to a "great" "risk of an erroneous deprivation" that could be remedied through additional "procedural safeguards." *Mathews*, 424 U.S. at 335. The empirical evidence in this case shows that a majority of Maine voters will be denied full participation in the 2020 General Election, McCarty Report, at 13, and that a substantial number will, by design, have their ballots exhausted before the final round if ranked-choice tabulation is triggered, *id.* at 12–13. As discussed in section I.A., the wide variety of incorrect and even ineffective balloting, as well as the disproportionate adverse effects on older and less educated Maine voters, demonstrate that these failures cannot be attributed to voter choice.

The risk of erroneous deprivation is magnified by the lack of pre-deprivation process. Maine exhausts voter ballots without *any* notice or opportunity to cure, let alone notice that is "reasonably calculated, under all the circumstances, to apprise" affected individuals of the deprivation, *Mullane v. Cent. Hanover Trust Co.*, 339 U.S. 306, 314 (1950), and afford them "the opportunity to respond, explain, and defend" before their rights are taken, *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 13 (1st Cir. 1988). Moreover, "[i]t cannot be emphasized enough that the consequence of [the Secretary's] decision—disenfranchisement—is irremediable." *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 218 (D.N.H. 2018) (applying *Mathews* to invalidate absentee ballot signature match requirement); *see also Doe v. Rowe*, 156 F. Supp. 2d 35, 47–51 (D. Me. 2001) (applying *Mathews* to invalidate Maine constitutional provision disenfranchising persons under guardianship). In addition, the value of additional procedural safeguards is high. If Maine were to employ a plurality standard in federal elections, the average rate of full voter

participation would increase dramatically.  *See* McCarty Report, at 13–16.

*Third*, these additional procedures would impose minimal "administrative burdens" on Maine.  *Mathews*, 424 U.S. at 335.  Maine already is constitutionally required to employ a plurality standard in state elections.  *Opinion of the Justices*, 162 A.3d at 209–11.  Using the same standard for federal elections would, if anything, decrease the administrative burden.

For these reasons, the RCV Act violates Plaintiffs' right to due process.

### D.      The RCV Act Violates Plaintiffs' Right To Equal Treatment.

Plaintiffs are also likely to succeed because the RCV Act denies them equal treatment under law.  The Fourteenth Amendment prohibits Maine from depriving "any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  In the context of voting rights, "the Equal Protection Clause safeguards the 'equal weight accorded to each vote and the equal dignity owed to each voter.'"  *Lyman*, 954 F.3d at 364 (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)).  Under the RCV Act, however, Plaintiffs are denied an equal vote even though Maine has not demonstrated that ranked-choice voting is "narrowly tailored" to advance a "compelling state interest."  *See Doe*, 156 F. Supp. 2d at 51 ("Maine's restriction on voting is subject to strict scrutiny because it restricts a fundamental right." (citing *Dunn*, 405 U.S. at 337)).

The empirical evidence in this case shows that Plaintiffs are disadvantaged by ranked-choice voting.  In each "round" of ranked-choice voting, voters who voted for losing candidates (typically, but not necessarily, minor party candidates) can shift their votes to different candidates for subsequent rounds.  Meanwhile, staunch Republicans like Sterling Robinson and Duane Lander may be "locked in" to their first-choice candidate with no ability to shift electoral support to other candidates.  *See* Robinson Declaration ¶ 16; Lander Declaration ¶¶ 16–17.  In addition, Mainers who fail to achieve full participation are at risk of having their ballot "exhausted" while other voters—typically younger, better educated voters—are permitted to

17

continue.  This "unequal treatment" punishes voters based on the "content" of their ballot and the political convictions they hold deeply.  *Cf. Barr v. American Ass'n of Political Consultants, Inc.*, 591 U. S. ____ (2020) (slip op. 6–7, 20).

For similar reasons, the RCV Act violates Plaintiffs' Twenty-Sixth Amendment right against abridgment of their right to vote "on account of age."  U.S. Const. amend. XXVI, § 1.  The empirical evidence shows that the RCV Act prevents a substantial number of older Maine voters from achieving full participation in the electoral process and exhausts their ballots at higher rates.  Section I.A.1, *supra*.  In other words, the RCV Act, "though neutral on its face, ha[s] the effect" of furthering "age discrimination."  *Walgren*, 482 F.2d at 101 (vacating dismissal of Twenty-Sixth Amendment claim).  If Maine continues to enforce the RCV Act notwithstanding its documented effects on older voters, that would provide strong evidence that the discrimination is intentional.  *See, e.g.*, *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1222 (N.D. Fla. 2018) (enjoining regulation that "does not identify college students by name" "because it bears so heavily on younger voters than all other voters.").  The disparate effects of the RCV Act violate Plaintiffs' constitutional rights on account of age.

For these reasons, Plaintiffs will succeed on their claim that the RCV Act violates their Fourteenth Amendment right to cast an equal vote, and their Twenty-Sixth Amendment right to do so regardless of age.

## II.   THE HARM TO PLAINTIFFS' CONSTITUTIONAL RIGHTS IS IRREPERABLE.

Absent a preliminary injunction, Plaintiffs' constitutional rights will be denied.  The denial of full participation in the 2020 General Election and the compulsion of full participation by threat of disenfranchisement deprives Plaintiffs of the freedom of speech.  That "unquestionably constitutes irreparable injury," *Sindicato Puertorriqueno de Trabajadores v.*

18

*Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), and this Court must "presume[ ]" that the irreparable injury standard is met "upon a determination that the movants are likely to prevail" on their speech and association claims, *id.* (granting injunction after finding irreparable injury as a matter of course); *see also Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla*, 490 F.3d 1, 21 (1st Cir. 2007) (same). In the First Circuit, it is well settled that a district court "necessarily err[s]" if it requires "an extensive analysis of this element" upon a showing of First Amendment harm. *Sindicato Puertorriqueno de Trabajadores*, 699 F.3d at 15 (citation omitted).

In addition, if the 2020 General Election goes forward under ranked-choice voting, Plaintiffs and other Maine "voters will suffer an injury" to their due process, equal protection, and other constitutional rights "that cannot be remedied by an award of monetary damages." *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005) (quotation marks omitted). Courts routinely find that burdens on voting rights constitute irreparable injury. *See, e.g.*, *League of Women Voters of N.C.*, 769 F.3d at 247; *Husted*, 697 F.3d at 436. This is because "once the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C.*, 769 F.3d at 247. The injury to Plaintiffs and other Maine "voters is real and completely irreparable if nothing is done to enjoin this law." *Id.*

## III.    THE BALANCE OF EQUITIES FAVORS PLAINTIFFS.

The balance of equities also weighs in favor of Plaintiffs. Absent an injunction, Plaintiffs and other Maine voters will continue to have their constitutional rights violated by the RCV Act. Because Mr. Lander plans to vote only for only on specific candidate in the 2020 General Election, Lander Declaration ¶¶ 16–17, he will be denied full participation. Conversely, because Mr. Robinson, Mr. Trudel, and Mr. Hagopian plan to vote for additional candidates to ensure that their votes are counted, Hagopian Declaration ¶ 12; Trudel Declaration ¶ 12; Robinson

19

Declaration ¶ 16, they will be compelled to speak and associate when they otherwise would not. Thus, absent an injunction, the RCV Act will impose irreparable harm on Plaintiffs.

By contrast, the only hardship that Maine will experience if the RCV Act is enjoined is that it will no longer be permitted to employ an unconstitutional method of vote tabulation. Maine has alternative means of conducting the 2020 General Election. One is to hold a majority runoff election. Another is to use a plurality standard—as Maine already is required to do in state elections by its Constitution. *See Opinion of the Justices*, 162 A.3d at 209–11. Any "administrative burden" associated with converting the 2020 General Election to a plurality standard would be minimal given that Maine already must use that standard for state races. Thus, the balance of hardships favors Plaintiffs.

## IV.    THE PUBLIC INTEREST FAVORS PLAINTIFFS.

Finally, granting a preliminary injunction will benefit the public interest. The public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). That interest would necessarily be served by an injunction enabling all Mainers—including older and less educated Mainers—to "cast their votes effectively." *Ayers-Schaffner*, 37 F.3d at 729. "Just as obviously, should the statute be unconstitutional, the public interest would be adversely affected by denial of such an injunction." *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988); *see also Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010) ("it is always in the public interest to prevent violation of a party's constitutional rights"); *Freeman v. Morris*, No. 11-cv-00452, 2011 WL 6139216, at *4 (D. Me. Dec. 9, 2011) (similar). Thus, the public interest would be served by an injunction.

## CONCLUSION

For all the foregoing reasons, the Court should grant the Motion for Preliminary Injunction and enter an order enjoining enforcement of the RCV Act.

Respectfully submitted,

July 22, 2020                   By:   /s/ Fred W. Bopp III
                                     Fred W. Bopp III
                                     **Bopp & Guecia**
                                     298 Main Street
                                     Yarmouth, ME 04096
                                     Telephone: 207-846-6111
                                     fbopp@boppguecia.com

                                     Michael E. Toner*
                                     Stephen J. Obermeier*
                                     Brandis L. Zehr*
                                     Jeremy J. Broggi*
                                     **WILEY REIN LLP**
                                     1776 K Street NW
                                     Washington, DC 20006
                                     Telephone: 202-719-7000
                                     MToner@wiley.law
                                     SObermeier@wiley.law
                                     BZehr@wiley.law
                                     JBroggi@wiley.law

                                     *Counsel for Plaintiffs*

                                     *Certifications for Admission Pro Hac Vice
                                     Forthcoming*