UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT HAGOPIAN, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 1:20-CV-00257-LEW |
| | ) | |
| MATTHEW DUNLAP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELMINARY INJUNCTION**

Plaintiffs' complaint contains five constitutional claims, most of which are a rehash of the claims that this Court expressly rejected in *Baber v. Dunlap*, 376 F. Supp. 3d 125 (D. Me. 2018). In *Baber*, this Court held that Maine's ranked-choice voting law ("RCV"), 21-A M.R.S.A. § 723-A, does not violate the Equal Protection Clause, the Due Process Clause, or the First Amendment.

To avoid this Court's rulings in *Baber*, plaintiffs and their expert, political science professor Nolan McCarty ("Prof. McCarty"), invented a metric they call "full voter participation," or "fully participating voter." According to plaintiffs, in order to be a "fully participating voter" a voter must rank at least all but one of the candidates in an RCV race. Their metric is untethered to the underlying statute, any constitutional principle, or any pertinent case law.

Plaintiffs' expert has also coined the related term, "truncated ballot," to describe a ballot in which the voter chose to rank fewer than all but one of the candidates in that race. This includes the ballot of a Maine voter who participated in the 2018 race for the Second Congressional District ("CD2") by ranking the candidate of her choice (e.g., Bruce Poliquin), and perhaps one other candidate (e.g., Tiffany Bond), but not ranking either of the other two candidates (e.g., Jared

1

Golden or William Hoar).  Roughly 67% of the voters chose to fill out their ballot by ranking only one or two candidates in that fashion in the 2018 CD2 race.

In particular, roughly 128,000 voters in that race (about 43% of the total ballots cast) voted only for Bruce Poliquin or Jared Golden and chose not to rank any other candidate.  Contrary to plaintiffs' claim, voters who filled out their ballots in that fashion "fully participated" in the election.  The candidate whom they ranked first continued to the final round, and their vote counted in each round.  There is no evidence to support any speculation that such voters were confused by the RCV ballot or instructions.  Indeed, in *Baber* this Court found that the RCV ballot and instructions were "more than adequate to apprise voters of how to express their preferences among the candidates."  *Baber*, 376 F. Supp. 3d at 144.

Likewise, all the plaintiffs "fully participated" in the 2018 CD2 election under any reasonable interpretation of that phrase.  Sterling Robinson ranked only Bruce Poliquin; his vote for Bruce Poliquin was counted in every round.  Duane Lander filled in the oval for Bruce Poliquin four times – as his first, second, third, and fourth choices; his vote for Bruce Poliquin was counted in each round, as it would have been if he had only filled in the first-choice oval for Poliquin. Robert Hagopian and James Trudel ranked Bruce Poliquin first, and then ranked other candidates in subsequent rounds; their votes for Bruce Poliquin were counted in each round.

All the plaintiffs may fully participate in the 2020 U.S. Senate race as well.  They are not required to rank any candidate whom they do not wish to support.  They have all stated their support for Susan Collins.  They are free to rank her as their first preference.  If they also want to support another candidate, then they are free to rank other candidates; if Senator Collins continues to the final round, their vote for her will count in each round.  Contrary to the assertions of Prof. McCarty, plaintiffs are not "required" to vote for any candidate whom they do not wish to support.

The core constitutional claims raised here were decided by this Court in *Baber*. No new or different constitutional issues are implicated by Prof. McCarty's invented metrics. To the extent that there are slight variations on the claims addressed in *Baber*, they are meritless. Plaintiffs' motion for a preliminary injunction ("PI Motion") should be denied.

## FACTUAL BACKGROUND

RCV Act. The voters of Maine adopted the RCV Act by citizen initiative in November 2016, thereby establishing RCV as the new method of voting and determining the outcome of elections for Congress, U.S. Senate, Governor, and the Maine House and Senate, as well as primary elections to select party nominees for all those offices, beginning in 2018. I.B. 2015, c. 3 (eff. Jan. 3, 2017). In May 2017, the Justices of the Maine Supreme Judicial Court advised the Maine Senate that implementing RCV in general elections for Governor and the Maine Legislature would violate the requirement in the Maine Constitution that candidates for those offices be selected based on a plurality of the votes cast. *Opinion of the Justices*, 2017 ME 100, ¶¶ 1, 7, 9, 57, 64-68, 72, 162 A.3d 188.

The Maine Senate tried unsuccessfully in April 2018 to block implementation of the RCV Act in state court on a variety of state-law grounds. *See Maine Senate v. Sec'y of State*, 2018 ME 52, ¶ 13, 183 A.3d 749. Shortly thereafter, the Maine Republican Party filed suit in this Court, seeking to enjoin the Secretary from using the RCV method to determine the outcome of the Republican primary on June 12, 2018, arguing that to do so would violate the Party's rights of association. This Court denied the Party's motion for preliminary injunction on May 29, 2018,

*Maine Republican Party v. Dunlap,* 324 F. Supp. 3d 202 (D. Me. 2018), and entered judgment for the Secretary in August 2018.[1]

    <u>November 2018 CD2 race</u>.  RCV was used in the November 2018 CD2 race because there were four candidates: Bruce Poliquin, Jared Golden, Tiffany Bond, and William Hoar.  Based on the tabulation of first-choice votes, no candidate received a majority.  The results of the initial tabulation were as follows: 134,184 for Poliquin; 132,013 for Golden; 16,552 for Tiffany Bond; and 6,875 for William Hoar.  *Baber*, 376 F. Supp. 3d at 130.  Bond and Hoar were both eliminated after that round since it was mathematically impossible for either of them to gain enough second-choice votes from each other's voters to overtake either Poliquin or Golden.

    To the extent voters who had selected Bond or Hoar as their first choice designated Poliquin or Golden as their second choice, those second-choice votes were added to the totals for Poliquin and Golden in round two.  The RCV process added votes to both Golden's and Poliquin's first-round totals, with the end result being that Golden received a majority of votes in the final round (50.62%) with a total of 142,440 votes to 138,931 for Poliquin.  *Baber*, 376 F. Supp. 3d at 131.

    <u>*Baber* lawsuit</u>.  After the November 2018 general election, but before the RCV counting process began, Brett Baber, Bruce Poliquin, and two other voters filed suit, challenging the constitutionality of RCV facially and as applied to the CD2 race.  *Baber v. Dunlap*, Docket No. 1:18-cv-00465-LEW.  As pertinent here, the *Baber* plaintiffs brought claims under the Equal Protection Clause, the Due Process Clause, and the First Amendment.  Plaintiffs contended that RCV was unconstitutional because their votes were rendered irrelevant or diluted by RCV.

---

[1]  Final judgment was entered on August 3, 2018.  *Maine Republican Party v. Dunlap*, Docket No. 1:18-cv-00179-JDL (ECF No. 34).  An appeal to the First Circuit was filed but soon thereafter was voluntarily dismissed.

Plaintiffs also argued that "several thousand voters were disenfranchised because they cast invalid overvotes or undervotes." *Baber*, 376 F. Supp. 3d at 143.

By order dated November 15, 2018, the Court denied plaintiffs' Motion for a Temporary Restraining Order ("TRO Motion"). *Baber*, 349 F. Supp. 3d 68, 73 (D. Me. 2018). On December 13, 2018, after an evidentiary hearing, the Court entered judgment in favor of the Secretary of State and the other defendants. *Baber*, 376 F. Supp. 3d at 145-46. The Court soundly rejected plaintiffs' Equal Protection, Due Process, and First Amendment arguments, as explained below.

*Equal Protection*. The *Baber* plaintiffs argued they were deprived of equal protection because one person's vote was being valued over that of another. *Baber*, 376 F. Supp. 3d at 139. The Court rejected the *Baber* plaintiffs' Equal Protection claims.

In denying their TRO Motion, the Court concluded "Maine's RCV system is designed to enable every voter the opportunity to express a preference, and be counted, with respect to the candidates most likely to win the election." *Baber*, 349 F. Supp. 3d at 77. "The RCV Act … is party-blind." *Id*. In the final judgment, the Court ruled that "Plaintiffs' votes were not rendered irrelevant or diluted by the RCV process." *Baber*, 376 F. Supp. 3d at 141. Their votes "remained and were counted. Presumably for this reason, Plaintiffs' expert, Dr. Gimpel, testified that Plaintiffs <u>participated fully</u> in the election." *Id*. (emphasis added).

The Court concluded:

> Maine's two congressional districts are geographically large, and the political views of its citizens are diverse. A majority of Maine's voters have expressed their interest in a manner of election that gives voice to these varied perspectives, while also permitting representation by those candidates most voters regard as the best of the practical alternatives. Through RCV, as applied to the Second District house race, majority rights have been advanced, and no minority rights have been burdened unduly, if at all…. Because RCV is "designed with the aim of providing a just framework within which the diverse political groups in our society may fairly compete and [was] not enacted with the purpose of assisting one particular group

in its struggle with its political opponents," it does not violate the Equal Protection Clause.

*Baber*, 376 F. Supp. 3d at 142-43 (quoting *Hunter v. Erickson*, 393 U.S. 385, 393 (1969) (Harlan, J., concurring)).

*Due Process*.  The *Baber* plaintiffs argued that RCV was "susceptible to producing arbitrary or irrational election results."  *Baber*, 376 F. Supp. 3d at 143.  In particular, they maintained that "a significant segment of the voting public cannot comprehend RCV sufficiently to cast a meaningful vote."  *Id*.

The Court rejected the *Baber* plaintiffs' Due Process claims, explaining that:

[t]he fortuity that some voters did not "guess correctly," as Plaintiffs put it, as to the run-off candidates is not evidence of voter confusion or disenfranchisement.  It is just as likely evidence that approximately 8,000 voters did not want to vote for either Mr. Golden or Mr. Poliquin regardless of whether they believed they would be the run-off candidates.  An expression of political preference that does not, even under RCV, favor either one of the two major-party candidates is not evidence of voter confusion.  To the contrary, it may as likely be evidence of voter clarity and conviction, which is no doubt what lead to the passage of the RCV Act in the first instance.

*Baber*, 376 F. Supp. 3d at 144.  The Court rejected the argument that RCV was confusing:

The Constitution does not require an easy ballot….  In a Nation founded on the principles of republican-representative government, nothing is to be gained from an electoral system that caters to the uninterested and uninformed.  The RCV system implemented in Maine is not so opaque and bewildering that it deprives a class of citizens of the fundamental right to vote.  In fact, I find the form of the ballot and the associated instructions more than adequate to apprise the voter of how to express preferences among the candidates.  Finally, I am not persuaded that it is unduly burdensome for voters to educate themselves about the candidates in order to determine the best way to rank their preferences.

*Id*. at 144-45.

*First Amendment*.  The *Baber* plaintiffs argued that RCV imposed a severe burden on their right to vote for the candidate of their choice and to associate with others.  The Court rejected the *Baber* plaintiffs' First Amendment claims.

In denying plaintiffs' TRO Motion, the Court ruled that "the RCV Act actually encourages First Amendment expression, without discriminating against any given voter."  *Baber*, 349 F. Supp. 3d at 78.  "[T]he burden placed on Plaintiffs' right to vote is modest, if it exists at all…." *Id*.

In the final judgment, the Court explained that the RCV Act does not burden voters' First Amendment rights:

> there is no dispute that the RCV Act – itself the product of a citizens' initiative involving a great deal of first amendment expression – was motivated by a desire to enable third-party and non-party candidates to participate in the political process, and to enable their supporters to express support, without producing the spoiler effect.  In this way, the RCV Act actually encourages First Amendment expression, without discriminating against any voter based on viewpoint, faction or other invalid criteria.  Moreover, a search for what exactly the burden is that Plaintiffs want lifted is not a fruitful exercise.  I fail to see how Plaintiffs' first amendment rights to express themselves in this election were undercut in any fashion by the RCV Act.  They expressed their preference for Bruce Poliquin and none other, and their votes were counted.

*Baber*, 376 F. Supp. 3d at 145.

<u>*Hagopian* lawsuit</u>.  On March 4, 2020, Lisa Savage gathered what she believed to be more than enough signatures on a nomination petition as an unenrolled (non-party) candidate for the U.S. Senate to qualify for the ballot – a fact that was well publicized.[2]  She submitted the petitions to the Secretary of State's office in early to mid-April, and on April 17, 2020, the Secretary of

---

[2] *See* the following articles published on March 4, 2020:
Associated Press, *Senate hopeful's supporters collect more than 6k signatures*, AP News  (March 4, 2020), https://apnews.com/aa1331951ae8c4035d5add9ae4771caf

Associated Press, *Senate hopeful says she has enough signatures to get on the Maine ballot*, Portland Press Herald (March 4, 2020), https://www.pressherald.com/2020/03/04/senate-hopeful-says-she-has-enough-signatures-to-get-on-maine-ballot/

Associated Press, *Lisa Savage says she has enough signatures to qualify for Senate race*, Bangor Daily News (March 4, 2020), https://bangordailynews.com/2020/03/04/news/lisa-savage-says-she-has-enough-signatures-to-qualify-for-senate-race/

State certified that the petition was valid and that Savage had qualified for the general election ballot, thus ensuring that the race for the U.S. Senate seat currently held by Susan Collins would be a multi-candidate race conducted by RCV.  Declaration of Deputy Secretary of State Julie Flynn ("Flynn Decl.") ¶¶ 6-7.  As of that time, plaintiffs were aware, or should have been aware, that RCV would be used in that race.[3]

More than three months later, on July 22, 2020, Robert Hagopian and three other individuals residing in Maine's Second Congressional District filed this lawsuit challenging the constitutionality of RCV facially and as applied to them in that U.S. Senate race.  Like the *Baber* plaintiffs, plaintiffs have brought claims under the First Amendment, the Due Process Clause, and the Equal Protection Clause.  They have also asserted a claim under the 26th Amendment to the United States Constitution.

Plaintiffs base their legal claims in part on how they voted in the 2018 CD2 election.  In that election, Mr. Hagopian ranked Bruce Poliquin first, and then ranked the three other candidates.  Hagopian Decl. ¶ 9.  He understood that if Poliquin were eliminated in the first round, his ballot "would be discarded" if he did not rank other candidates and he wanted "to ensure that my vote was counted and to prevent Jared Golden from being elected."  *Id.* ¶¶ 13-14.  Without RCV, he "would not have supported candidates other than Bruce Poliquin."  *Id.* ¶ 15.

Plaintiff Duane Lander ranked Bruce Poliquin "in each round" in the 2018 CD2 election, filling in the "circle" (or oval) for Poliquin four times.  Lander Decl. ¶ 10.  Mr. Lander "did not want to vote for any other candidate."  *Id.*  He claims that he was "very confused" about how RCV

---

[3]  Every election for Congress or U.S. Senate with more than two candidates who have qualified for the ballot is subject to RCV.  21-A M.R.S.A. § 1(27-C).  This means that an RCV-style ballot, with ovals for the voter to fill in indicating their ranked preferences for each candidate, will be designed and printed for each of those races – even if one candidate receives more than 50% of the first-choice votes, thereby making it unnecessary to proceed to multiple rounds of counting using the RCV method.  *See* 21-A M.R.S.A. § 723-A; Secretary of State's RCV rules, 29-250 Code Me. Reg. ch. 535, § 1.

worked in 2018.  *Id.* ¶ 9.  Mr. Lander also claims that he did not understand "that Poliquin could receive the highest number of votes in the first round and lose in the second round."  *Id.* ¶ 12.  He believed that if he had only filled in the first-choice oval for Poliquin, his vote (and that of others who filled out their ballots in this manner) would not have counted.  *Id.* ¶ 11.

Plaintiff Sterling Robinson ranked Bruce Poliquin in the first round, but not any other candidates.  Robinson Decl. ¶ 10.  He claims that he "was confused regarding the actions necessary to ensure that my vote was counted in each round of ranked-choice voting."  *Id.* ¶ 12.

Plaintiff James Trudel ranked Bruce Poliquin first, and then ranked the three other candidates in the 2018 CD2 election.  Trudel Decl. ¶ 9.  He voted for candidates other than Bruce Poliquin "to prevent Jared Golden from being elected."  *Id.* ¶ 14.

Plaintiffs' votes for Bruce Poliquin were all counted.  Their ballots were not exhausted.  Because Bruce Poliquin was a continuing candidate who made it to the final round, their votes for him counted in every round regardless of what ovals they marked below their first-choice ranking for him.  Thus, all four plaintiffs "fully participated" in the 2018 CD2 election under any reasonable interpretation of that phrase.

All four plaintiffs plan to vote for Susan Collins in the race for U.S. Senate and to rank her as their first preference.  Hagopian Decl. ¶ 18; Lander Decl. ¶ 16; Robinson Decl. ¶ 16; Trudel Decl. ¶ 18.  Three of the plaintiffs will also rank other candidates "to ensure that [their] ballot is counted."  Hagopian Decl. ¶ 19; Robinson Decl. ¶ 16; Trudel Decl. ¶ 18.  Mr. Lander plans to rank Susan Collins in each round "in order to ensure that my vote is counted."  Lander Decl. ¶ 16.  Mr. Robinson claims that he still does "not understand how to rank the candidates to both ensure that my preferred candidate is in the best position to win while ensuring that my ballot will not be exhausted."  Robinson Decl. ¶ 18.

Plaintiffs allege that they are "at risk" of being "disenfranchised" in the upcoming race for U.S. Senate because, although they intend to rank Susan Collins as their first choice, their ballots will be "at risk" of not being counted "in the final round."  PI Motion at 1, 5, 7, 8.

Plaintiffs filed their PI Motion on July 22, 2020 (the same day they filed their complaint), supported by an expert report and declarations from all four plaintiffs.  In response to plaintiffs' request, the Court shortened the time that the Secretary of State had to respond to the PI Motion from 21 days to 14 days.  On July 27, 2020, plaintiffs filed an amended expert report.

In that amended report, Prof. McCarty claims that only 37% of Maine voters "fully participated" in the 2018 CD2 general election by ranking at least all but one of the candidates. McCarty Report at 11-13 & Table 3.  Plaintiffs claim that this metric means that "nearly two-thirds of Maine voters had been denied full participation and placed at risk of disenfranchisement."  PI Motion at 1, 7-8.  Included in the category of voters whom plaintiffs claim were "denied full participation" in the 2018 CD2 election were (A) the roughly 128,000 voters who ranked Bruce Poliquin or Jared Golden as their first preference, but ranked no other candidate, *see* Dr. James G. Gimpel, Ph.D. Supp. Disclosure, Ex. A in *Baber v. Dunlap* (ECF No. 51); and (B) the nearly 6,000 Maine voters who ranked Tiffany Bond or William Hoar as their first preference, but ranked no other candidate, *see Baber*, 376 F. Supp. 3d at 131 n.6.

Voter participation.  The overall number of voters casting ballots in U.S. Senate elections in Maine has ranged from approximately 617,000 to 725,000 over the last ten years, and in Congressional District 2 races, it has ranged from 275,000 to almost 365,000.  *See* Exhibit 2A to Flynn Declaration.  Primary elections draw far fewer voters since only the voters enrolled in the party may participate.  In the primary elections for U.S. Senate during this ten-year period, the number of Democratic voters participating has ranged from 60,000 to 173,000, while the

Republican primary has drawn from approximately 62,000 to 101,000.  *See* Ex. 2B to Flynn Decl. The data for CD2 for both parties shows a range of approximately 22,000 to 63,000 voters, with over 50,000 in both RCV elections.  *Id.*

The RCV results in the 2018 CD2 race show that a total of 6,453 voters cast ballots that could not be counted in the first round:  6,018 undervoted by failing to mark either a first or a second choice, and 435 overvoted by marking a first choice for more than one candidate.  Flynn Decl. ¶ 9 & Ex. 1.  This represents 2.2% of the total number of 296,077 ballots cast in that race. In previous general elections for CD2, where voters were able to choose only one candidate and the winner was determined by plurality, the comparable number of voters whose ballots were not counted due to undervotes or overvotes ranged from 3% to 4.3%.  Flynn Decl. ¶ 10 & Ex. 2A.

Three candidates competed in the U.S. Senate race in 2018 – a Republican, a Democrat, and Senator Angus King as a non-party candidate.  Accordingly, voters cast an RCV style ballot, even though multiple rounds of RCV counting were not required because Senator King obtained a majority of first-choice votes.  Of the 646,064 ballots cast in that race, 11,655 ballots – 1.8% of the total – could not be counted either because the voter failed to mark a first choice, or because the voter marked more than one candidate as their first choice.  Of the 616,967 ballots cast in the previous race for U.S. Senate, which was conducted by plurality voting in 2014, 12,959 ballots – 2.1% of the total – could not be counted due to an overvote or an undervote.  Flynn Decl. ¶ 10(b) & (c) & Ex. 2A.

The results for CD1 are comparable.  In 2018, voters cast an RCV ballot for CD1 because three candidates were on the ballot, but RCV rounds of tabulating were not required because Rep. Pingree retained her seat by obtaining more than 50% of the first-choice votes.  Voters failed to mark any candidate as their first choice on 7,910 ballots representing 2.3% of the

349,963 ballots cast.  In the previous four election cycles, decided by plurality, the percentages of ballots cast in the CD1 race that could not be counted due to undervotes or overvotes ranged from a low of 2.6% in 2010 to a high of 4.2% in 2012.  Flynn Decl. ¶ 10(b) & (c) & Ex. 2A.[4] The number of voters participating in U.S. Senate and Congressional elections both before and after implementation of RCV are shown on Exhibit 2A and 2B to the Flynn Declaration.

## ARGUMENT

To prevail on a motion for preliminary injunction, plaintiffs must establish four factors: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in [its] favor, and (4) service of the public interest."  *Baber*, 349 F. Supp. 3d at 74.

"Injunctive relief is an extraordinary and drastic remedy that is never accorded as of right." *Baber*, 349 F. Supp. 3d at 74 (internal quotations and citations omitted).

Like all state statutes whose constitutionality is being challenged, the RCV law is presumed to be valid.  *See Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944).  Plaintiffs bear the heavy burden of proving that the RCV Act violates their constitutional rights.

As this Court noted in denying plaintiffs' TRO Motion in *Baber*, "[t]he sine qua non of [the] four-part inquiry" is likelihood of success on the merits.  *Baber*, 349 F. Supp. 3d at 75.  If plaintiffs cannot demonstrate this, then the Court need not even address the other three factors.  In this instance, plaintiffs have failed to establish a likelihood of success on the merits of any of their constitutional claims.  They also failed to show irreparable harm, that the balance of equities favors them, or that an injunction would be in the public interest.

---

[4]  The data for primary elections also shows a lower percentage of votes that could not be counted in RCV elections, as compared to almost all of the plurality elections.  *See* Flynn Decl. ¶ 10 & Ex. 2B.

I.      **Plaintiffs have not established a likelihood of success on the merits of their claims.**

A.      First Amendment claim.

Standard of review.  States have considerable latitude to determine the time, place, and manner of holding federal elections, including setting rules for "the registration and qualifications of voters, and the selection and qualifications of candidates."  *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see Baber*, 376 F. Supp. 3d at 145; *Maine Republican Party*, 324 F. Supp. 3d at 212-13. Moreover, the Supreme Court has long recognized that each regulation "inevitably affects – at least to some degree – the individual's right to vote and … to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).  The constitutionality of a state election regulation must be evaluated according to a "flexible standard" of review, whereby "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  Only if the burden is found to be severe must the state demonstrate that the regulation is narrowly tailored to serve a compelling state interest.  When the burden on those rights is less than severe, the State need only show an important regulatory interest to support a reasonable, nondiscriminatory restriction. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).

RCV imposes a slight, if any, burden.  This Court has already held the RCV Act imposes a "modest burden," if any, on voters.  *Baber*, 349 F. Supp. 3d at 78 ("[T]he burden placed on Plaintiffs' right to vote is modest, if it exists at all…."); *see Maine Republican Party*, 324 F. Supp. 3d at 212 (RCV Act "does not impose a heavy or severe burden on the Maine Republican Party's associational rights").  Moreover, RCV does not discriminate between or among candidates, parties, or groups of voters.  *See Baber*, 349 F. Supp. 3d at 77 (RCV "is party-blind").  Agreeing

with Judge Levy's ruling in *Maine Republican Party*, this Court held in *Baber* that "the RCV Act is not subject to strict scrutiny under the First Amendment." *Baber*, 376 F. Supp. 3d at 145.

Plaintiffs claim that RCV imposes a "severe burden" on them because it "requires Plaintiffs to 'rank' enough candidates on the ballot to ensure that theirs is a 'continuing ballot' that survives and is counted in the determinative 'final round.'" PI Motion at 7-10. Plaintiffs' alleged "burden" is a repackaging of their expert's "full voter participation" metric. The Court rejected this same argument in *Baber*.

Moreover, plaintiffs' claimed burden is based on a fundamental misunderstanding, or mischaracterization, of how RCV works. Plaintiffs are not required to vote for any candidate whom they do not wish to support. They plan to support Susan Collins and are free to rank her as their first preference. If they fill in the first-choice oval for Susan Collins and leave the rest of the ballot blank, their vote for her will count in every round if she is a continuing candidate in every round. If the plaintiffs also want to support other candidates in the unlikely event that Susan Collins is eliminated before the final round, then they are free to rank other candidates in subsequent rounds. They may also rank Susan Collins as their first, second, third, and fourth choice if that is their preference, and their vote for her will count in every round if she continues to the final round.

As this Court explained in *Baber*, voters are not "burdened" or "disenfranchised" if they are unable to "guess" correctly which candidates will be in the final round. *Baber*, 376 F. Supp. 3d at 144. In this year's U.S. Senate race, it is extremely likely that Senator Collins – a four-term incumbent – will be a continuing candidate and will still be there in the final round.

Plaintiffs' "full voter participation" metric is premised on the ability to cast a vote in a particular strategic manner that plaintiffs and their expert Prof. McCarty have conceived for

purposes of this lawsuit.  According to Prof. McCarty, "there is no strategic reason for a voter to undervote in an RCV election."  McCarty Report at 11, 17.[5]  Prof. McCarty concluded, by looking at the 2018 cast vote data, that "a significant number of Maine voters who participated in the 2nd CD election cast votes that similarly defy any clear strategic or logical reason."  McCarty Report at 11.  He opined that "ballot exhaustion, and the risk of ballot exhaustion due to truncated votes, cannot be attributed to voter choice."  *Id.*  Like plaintiffs' expert Dr. Gimpel in *Baber*, Prof. McCarty did not interview any Maine voters in preparing his report; his analysis was "guided by [his] training as a political scientist and economist."[6]  McCarty Report at 1.

Prof. McCarty included in his "truncated vote" category the nearly 6,000 voters who ranked Tiffany Bond or William Hoar as their first preference, but ranked no other candidate.  Based on his training as a political scientist and economist and his review of data from the 2018 CD2 race, Prof. McCarty opined that it was "unlikely" that voters who filled out their ballots in that fashion were engaging in "voter expression."[7]  McCarty Report at 23.

Prof. McCarty has not provided a sound basis for his opinions about "voter expression," and the Court should disregard them.  Contrary to Prof. McCarty's opinions, if voters were not attracted to either of the major parties' candidates, it makes perfect sense that they would express a preference only for Ms. Bond or Mr. Hoar.

Prof. McCarty then opined that, "[e]xamining the data, it becomes clear that the complexity of the RCV system leads to voter confusion, which prevents voters from fully participating."

---

[5]  Prof. McCarty defines "undervote" differently than the RCV Act and rules do.  McCarty Report at 5.
[6]  The conclusions of Prof. McCarty, who is a Professor of Politics, are largely policy judgments.  His report explains his view that the "purported benefits of RCV have not manifested in jurisdictions where RCV has been utilized over long periods of time."  McCarty Report at 2-3, 5, 23-28.
[7]  Prof. McCarty offered the same opinion about those voters who ranked Bruce Poliquin or Jared Golden first, but chose not to rank any other candidates – that those votes were not likely "a product of voter expression."  McCarty Report at 23.

McCarty Report at 23.  According to Prof. McCarty, RCV is "so complex, confusing, and opaque as to deprive voters of the ability to exercise those choices in an informed and meaningful way." McCarty Report at 29.  Prof. McCarty did not explain, at all, in what respects the RCV is "so complex, confusing, and opaque."

Prof. McCarty's opinions on "voter confusion" should also be disregarded.  This Court rejected that precise argument in *Baber*.  "An expression of political preference that does not, even under RCV, favor either one of the two major-party candidates is not evidence of voter confusion." 376 F. Supp. 3d at 144.  This Court found "the form of the ballot and the associated instructions more than adequate to apprise the voter of how to express preferences among the candidates" and held that it was not "unduly burdensome for voters to educate themselves about the candidates in order to determine the best way to rank their preferences."  *Baber*, 376 F. Supp. 3d at 144-45.

Likewise, plaintiffs' claimed inability to fully comprehend how RCV works does not create a First Amendment burden.  By July 2020, every Maine voter has had ample opportunity to educate themselves about RCV and how to express preferences among the candidates.

To the extent that plaintiffs claim to be confused about how to "ensure" that their ballot is a continuing ballot, that is merely another way of saying that they want to "ensure" that they will be able to "guess correctly" which candidates will be in the final round.  Again, the Court has already ruled that a voter's inability to correctly "guess" who will be in the final round does not amount to a constitutional burden.  *Baber*, 376 F. Supp. 3d at 144.

RCV may present voters with different strategic options than other voting systems, but any resulting burden is slight.  *Baber*, 349 F. Supp. 3d at 78; *Maine Republican Party*, 324 F. Supp. 3d at 212.  Under RCV, voters retain the ability to cast an effective vote – a "fully participating vote" – for as many or as few candidates as they wish.

None of the cases cited by plaintiffs supports a conclusion that a voter's decision not to vote as Prof. McCarty believes they should vote – his view of a "strategic" or "logical" vote – imposes a severe burden on plaintiffs' (or any voter's) First or Fourteenth Amendment rights.  The cases cited by plaintiffs in support of their alleged "heavy burden" bear no resemblance to the issues raised by the RCV Act.  *See* PI Motion at 6-9, citing *Gray v. Sanders*, 372 U.S. 368, 370-72 (1963) (challenge to county voting system that weighted rural votes more heavily than urban votes and weighted some small rural counties more heavily than other larger rural counties); *Walgren v. Howes*, 482 F.2d 95, 96-98 (1st Cir. 1973) (challenge to municipal ordinance that changed election date allegedly to purposefully deny vote to class of voters); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315-17 (11th Cir. 2019) (challenge to statute allowing election officials to reject vote-by-mail ballots); *Lyman v. Baker*, 954 F.3d 351, 355-56 (1st Cir. 2020) (challenge to statute providing for winner-take-all method of selecting presidential electors); *Obama for Am. v. Husted*, 697 F.3d 423, 425-26 (6th Cir. 2012) (challenge to statute prohibiting certain voters from voting early in-person); *Veasey v. Abbott*, 830 F.3d 216, 225-27 (5th Cir. 2016) (challenge to statute requiring voters to present identification in order to cast vote); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 229-30 (4th Cir. 2014) (challenge to statutes that, among other things, required voters to present identification in order to cast vote and eliminated same-day voter registration and out-of-precinct voting).

Important governmental interests.  Given the slight burdens (if any) imposed by RCV, the State need only show an important regulatory interest that is furthered by this system.  Courts that have addressed challenges to RCV and similar voting systems, including this Court in *Baber* and in *Maine Republican Party*, 324 F. Supp. 3d at 212-13, have recognized a number of important interests.  *See, e.g., Minnesota Voters Alliance v. City of Minneapolis*, 766 N.W.2d 683, 697 (Minn.

2009); *Dudum v. Arntz*, 640 F.3d 1098, 1116 (9th Cir. 2011).  For example, RCV allows voters to express more nuanced preferences among multiple candidates than is possible in a single-round plurality election, while avoiding the "spoiler" effect that minor candidates' participation can cause.  RCV aims to encourage greater participation in the electoral process by voters and candidates, which furthers First Amendment interests.  RCV also produces a winning candidate with majority support of all the voters who participated, while avoiding the inconvenience and cost to voters and taxpayers of holding a separate run-off election.

Plaintiffs are able to express their preferences for as many candidates as they choose.  The governmental interests that are furthered by RCV are sufficiently important to support a reasonable, non-discriminatory regulation defining the "manner" of conducting elections.  *See Baber*, 376 F. Supp. 3d at 145; *Maine Republican Party*, 324 F. Supp. 3d at 212-13.   The RCV Act does not violate plaintiffs' First Amendment rights.

Plaintiffs' First Amendment merits arguments.  Plaintiffs contend that, regardless of the level of scrutiny, RCV violates their "right to vote" because it "threatens disenfranchisement for a majority of Maine voters" (presumably including them) at the upcoming election.  PI Motion at 6, 10-12.  Using their expert's "full participation" metric, plaintiffs also claim that "nearly two-thirds of Maine voters had been denied full participation and placed at risk of disenfranchisement" in the 2018 CD2 election.  PI Motion at 1.  None of the plaintiffs claim that *they* were "actually disenfranchised" by RCV in that election.  Their First Amendment claim is based on a flawed premise and is meritless.

All four plaintiffs "fully participated" in the 2018 CD2 election under any reasonable interpretation of the phrase.  Each of them voted for Bruce Poliquin, and their votes counted.

Indeed, this Court already indicated as much in *Baber* in describing the nature of the plaintiffs' votes. *See Baber*, 376 F. Supp. 3d at 141.

As for the upcoming election, plaintiffs are not required to vote for any candidate whom they do not wish to support. They plan to support Susan Collins and are free to rank her as their first preference. If they rank Susan Collins as their first preference and leave the rest of the ballot blank, their vote for her will count in every round if she is a continuing candidate in every round. If the plaintiffs also want to support other candidates in the unlikely event that Susan Collins is eliminated before the final round, then they are free to rank other candidates in subsequent rounds. None of them is at risk of "disenfranchisement."

Citing Table 3 in the McCarty Report, plaintiffs also contend, remarkably, that "thousands of voters" were "in fact" "actually disenfranchised" by RCV in the 2018 CD2 election. PI Motion at 10. Their definition of "disenfranchised" is fundamentally flawed.

Table 3 in Prof. McCarty's Report states that there were 14,706 "ballots not counted" in the 2018 CD2 election and that this figure represented 10.5% of the "total ballots."[8] Prof. McCarty defines "ballots not counted" as ballots that were not tabulated in the <u>final</u> round, which is what the RCV Act and rules refer to as an "exhausted ballot."[9] McCarty Report at 5. (This includes overvotes, undervotes, and ballots reflecting choices for candidates who had been eliminated after round 1.) He and the plaintiffs contend that all 14,706 of the voters who cast these ballots were "disenfranchised." However, more than half of these ballots (7,820) were not counted in the final round simply because the voters did not select one of the continuing major party candidates as

---

[8] Prof. McCarty's mathematical calculation appears to be in error. His number of 14,706 "ballots not counted" (which includes all undervotes, overvotes and ballots exhausted in the second round) represents only 4.97% (not 10.5%) of the 296,077 total ballots cast in the November 2018 CD2 election. *See Baber*, 376 F. Supp. 3d at 131 n.6; Ex. 1 to Flynn Decl.

[9] Prof. McCarty defines "exhausted ballot" differently than the RCV Act and rules. McCarty Report at 5.

their second or third choice.  *See* Ex. 1 to Flynn Decl. This does not mean the voters were disenfranchised or failed to participate in the CD2 election – any more than one could say that a voter who votes for a losing candidate in a plurality election is disenfranchised.  All of these voters participated in the election and made choices that were counted in round one.  They just did not choose one of the candidates who obtained enough first-choice rankings to continue to the final round.

Of Prof. McCarty's 14,706 "ballots not counted," a total of 6,453 were ballots where the voters left their first and second choices entirely blank, or "overvoted" by ranking more than one candidate at the same ranking such that their ballots could not be counted.  Flynn Decl. ¶ 9 & Ex. 1.  This represents 2.2% of the total ballots cast in the CD2 race – a smaller percentage than the comparable number in the previous CD2 election with a non-RCV or traditional plurality ballot. Flynn Decl. ¶ 10(b) & (c) & Ex. 1.

Plaintiffs' contention that these voters were "actually disenfranchised" by RCV is contrary to *Baber* and lacks any support in logic or the case law.  Voters who ranked only Tiffany Bond or William Hoar fully participated in the 2018 CD2 election.  Voters who left their ballot blank were not "disenfranchised," nor were voters who cast undervotes or overvotes.  And the percentage of voters who cast undervotes or overvotes was generally less than in previous plurality elections. *See* Flynn Decl. Exs. 2A & 2B.

Plaintiffs presented no evidence that RCV has decreased overall voter participation in Maine (assuming *arguendo* that this fact is pertinent to their constitutional claims).  The record evidence suggests otherwise.  *See* Flynn Decl. ¶¶ 9-10 & Exs. 2A & 2B.

Plaintiffs cited no case in which a court has held that RCV violates the First Amendment. Plaintiffs have not demonstrated a likelihood of success on the merits of their First Amendment claim.

B.      Compelled-speech claim.

Plaintiffs have also asserted a First Amendment compelled-speech claim. PI Motion at 14-15. According to plaintiffs, "the only way for voters to guarantee that their ballot will be counted in the final round is to rank every candidate in that race except for one," and this violates their First Amendment right not to associate with candidates whose views they do not support. *Id*. at 14.

As explained above, plaintiffs are not compelled to vote for any candidate. They may rank as many or as few candidates as they wish.

Plaintiffs' compelled-speech claim is a rehash of the claim in *Baber* that the voters were harmed because they may not be able to "guess correctly" which candidates will be in the final round. The Court rejected that claim, ruling that such a circumstance "is not evidence of voter confusion or disenfranchisement." *Baber*, 376 F. Supp. 3d at 144.

The case law on which plaintiffs rely has no applicability here. *See, e.g., Janus v. Am. Fed'n of State, Cty. & Mun. Emps. Council 31*, 138 S. Ct. 2448, 2459-61 (2018) (challenge to statute authorizing public-sector unions to impose agency fees on non-member public employees); *In re Hickenlooper*, 312 P.3d 153, 155 (Colo. 2013) (challenge to state constitutional provision requiring elector who wished to vote for successor candidate in recall election to also cast ballot on recall issue); *Partnoy v. Shelley*, 277 F. Supp. 2d 1064, 1069 (S.D. Cal. 2003) (challenge to statute providing that no vote cast in gubernatorial recall election would be counted for any candidate unless the voter also voted on the recall question).

Plaintiffs have not shown a likelihood of success on their compelled-speech claim.

C.     Due Process claim.

Plaintiffs are raising a procedural due process claim under *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).  PI Motion at 15-17.  The essence of their claim is that RCV is constitutionally infirm because they are not given "notice" and an opportunity to "cure" their ballot if their RCV ballot is not going to be counted in the final round in the event that they do not guess correctly who will be in the final round.  PI Motion at 16.  This claim is meritless.

Any right to procedural due process that may be implicated by the RCV Act is satisfied. Plaintiffs will have the opportunity to rank as many candidates on their ballot as they wish.  The "risk" of ballot exhaustion does not constitute the risk of an erroneous deprivation for purposes of procedural due process.

Plaintiffs' rights to procedural due process are not violated if they are not given "notice" and the chance to "cure" their RCV ballot if they have not guessed correctly which candidates will be in the final round.  Plaintiffs have cited no case law that would support such a theory.  This Court rejected that theory in *Baber*.

Again, these four plaintiffs have stated their intention to rank Susan Collins as their first preference in the race for U.S. Senate.  The likelihood that she will not be a candidate in the final round is extremely remote.

Plaintiffs have not shown that they are likely to succeed on the merits of their procedural due process claim.

D.     Equal Protection claim.

Plaintiffs contend that they "are denied an equal vote" under the RCV Act.  As support for this claim, they argue that two of them are "staunch Republicans" who "may be 'locked in' to their first-place candidate with no ability to shift electoral support to other candidates."  PI Motion at

17.  They claim that "other voters – typically younger, better educated voters – are permitted to continue," and that this "unequal treatment" violates the Equal Protection Clause.  *Id*. at 17-18.

The Equal Protection Clause requires that each qualified voter must be given an equal opportunity to participate in that election.  A "State may not, by [] arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

Rational basis review applies to plaintiffs' equal protection claim.  Any burden imposed by the RCV Act is slight, and the RCV Act is non-discriminatory and "party-blind."  *Baber*, 349 F. Supp. 3d at 77.

Under RCV, each qualified voter is given an equal opportunity to vote.  As this Court concluded in *Baber*:

> Because RCV is "designed with the aim of providing a just framework within which the diverse political groups in our society may fairly compete and [was] not enacted with the purpose of assisting one particular group in its struggle with its political opponents," it does not violate the Equal Protection Clause.

*Baber*, 376 F. Supp. 3d at 142-43 (citation omitted).  That same reasoning applies here with equal force.

Plaintiffs cited no case in which a court has held that RCV violates voters' equal protection rights.  Plaintiffs have not shown a likelihood of success on the merits of their equal protection claim.

E.  Twenty-Sixth Amendment claim.

Section 1 of the 26th Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."  Plaintiffs allege that RCV disadvantages older Maine voters in violation of that provision.

The basis for plaintiffs' allegation is the data analyzed by Prof. McCarty showing an alleged correlation between age and "truncated ballots." McCarty Report at 16-22. Prof. McCarty posits that older Maine voters are more likely to vote for fewer than all but one of the candidates in an RCV election (*i.e.*, to cast what he terms a "truncated ballot").

Prof. McCarty's statistical analysis – even assuming *arguendo* it is valid and accurate[10] – is of no consequence to any issue raised by any of plaintiffs' constitutional claims. His "fully participating voter" and "truncated ballot" metrics were invented for purposes of this lawsuit, and they do not implicate any constitutional right.

Contrary to Prof. McCarty's assertions, there are numerous reasons why a voter may undervote (i.e., leave an oval blank) in an RCV election, just as a voter may do in a plurality election. For example, a voter may not wish to be associated with several candidates in the race by ranking those candidates at all. In addition, a voter may want to vote for just the candidate of their choice as a "protest vote." There are various other reasons, "strategic," "logical," and otherwise, to leave an oval blank on an RCV ballot. As noted above, Prof. McCarty did not interview any Maine voters in preparing his report; his analysis was "guided by his training as a political scientist and economist." McCarty Report at 1.

And in any event, contrary to Prof. McCarty's underlying premise, not all voters choose to vote in what he would define as a "strategic" or "logical" manner. The fact that voters may choose not to vote in a manner that appears to him to be "strategic or "logical" is not evidence that the voting method at issue is unconstitutional.

---

[10] Given the short amount of time that defendants have had to review and respond to plaintiffs' PI Motion and supporting materials, including Prof. McCarty's expert report, defendants have not had a chance to fully analyze Prof. McCarty's methods and conclusions. Defendants do not concede that Prof. McCarty's methods or conclusions are sound or accurate.

Plaintiffs presented no evidence that actually supports their argument that RCV "disenfranchises" older voters. All they have presented is some statistical analysis that *may show* that older voters choose to rank fewer than all but one of the candidates in RCV races (*i.e.*, to cast what Prof. McCarty terms a "truncated ballot"). That is not evidence that the RCV Act unlawfully discriminates against older voters.

Plaintiffs cited no case in which a court has held that RCV violates the 26th Amendment. Plaintiffs have not demonstrated a likelihood of success on the merits of their 26th Amendment claim.

## II.    **Denial of preliminary injunctive relief would not cause irreparable harm to plaintiffs**.

Plaintiffs have not shown that they would be irreparably harmed by the use of RCV if the Court does not enter an injunction. Plaintiffs are able to express their preferences for as many or as few candidates as they choose. The chance that plaintiffs may not "guess correctly" as to which candidates are in the final round is not evidence of voter confusion or disenfranchisement and does not constitute irreparable harm. *Baber*, 376 F. Supp. 3d at 144.

The fact that some of the plaintiffs claim that they are still "confused" by RCV does not constitute irreparable harm. As this Court explained in 2018 in *Baber*:

> The RCV system implemented in Maine is not so opaque and bewildering that it deprives a class of citizens of the fundamental right to vote. In fact, I find the form of the ballot and the associated instructions more than adequate to apprise the voter of how to express preferences among the candidates. Finally, I am not persuaded that it is unduly burdensome for voters to educate themselves about the candidates in order to determine the best way to rank their preferences.

376 F. Supp. 3d at 144-45. An instructional poster is displayed in every voting booth in the state to explain to voters who are unsure how to mark a ballot for an RCV contest. *See* Flynn Decl. ¶ 12 & Ex. 4.

### III.   The balance of equities tips strongly against plaintiffs.

The balance of equities weighs against plaintiffs in this case for several reasons.  As shown above, plaintiffs have not shown that they will be harmed if RCV is used in the upcoming election.

By comparison, enjoining the defendants from employing RCV in the upcoming election – and switching to some other voting method at this late date – would cause rampant confusion among municipal officials and the voting public.

Courts are reluctant to grant injunctions in election cases, in particular, because the harm falls on all citizens of a state.  *See Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (citing cases).  Courts are even more reluctant to issue injunctions in the middle of an election cycle.  *See Republican National Committee v. Democratic National Committee*, 589 U.S. _, 140 S. Ct. 1205 (April 6, 2020) (*per curiam*); *Purcell* v. *Gonzalez*, 549 U.S. 1, 5-6 (2006) (*per curiam*); *Frank* v. *Walker*, 574 U.S. 929 (2014) (Mem.).

In addition, plaintiffs knew or should have known as of at least mid-April 2020 – more than three months before they filed this lawsuit – that they would be casting a ranked-choice ballot in the general election for U.S. Senate.   Flynn Decl. ¶¶ 6-7.  "A party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam).  Plaintiffs have not been reasonably diligent in pursuing their claims.

In prior election cases, this Court and the First Circuit have found that the balance of equities disfavored parties belatedly seeking injunctive relief, and it should do so here as well.  *See Dobson v. Dunlap*, 576 F. Supp. 2d 181, 188 (D. Me. 2008) (no constitutional right to procrastinate); *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010) (claimed emergency was largely of plaintiffs' own making); *League of Women Voters v. Diamond*, 923 F. Supp. 266,

275 (D. Me. 1996) (plaintiffs' delay contributed in significant part to request for somewhat urgent preliminary injunction).

**IV.    Granting plaintiffs' motion for a preliminary injunction would harm the public interest.**

The public interest is best served by keeping the status quo in place and giving full effect to the duly enacted laws of the State.  "Maine's RCV Act reflects the view of a majority of the voting public in Maine that their interests may be better represented by the candidate who achieves the greatest support among those who cast votes, than by the candidate who is first 'past the post' in a plurality election dominated by two major parties." *Baber*, 376 F. Supp. 3d at 137-38.

## CONCLUSION

For the reasons stated above, the Court should deny plaintiffs' Motion for a Preliminary injunction.

Dated:  August 5, 2020                                        Respectfully submitted,


                                                             /s/ Phyllis Gardiner
                                                             PHYLLIS GARDINER
                                                             Assistant Attorney General
                                                             Phyllis.gardiner@maine.gov
                                                             THOMAS A. KNOWLTON
                                                             Assistant Attorney General
                                                             Thomas.a.knowlton@maine.gov
                                                             Office of the Attorney General
                                                             6 State House Station
                                                             Augusta, Maine  04333-0006
                                                             Tel.  (207) 626-8830
                                                             Fax (207) 287-3145

                                                             Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of August 2020, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to all registered participants.

<div style="margin-left:45%;">

/s/ Phyllis Gardiner
PHYLLIS GARDINER
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8830
Fax (207) 287-3145
phyllis.gardiner@maine.gov

</div>