**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

ROBERT HAGOPIAN,

DUANE R. LANDER,

STERLING B. ROBINSON, and

JAMES T. TRUDEL

                 *Plaintiffs*,

        v.

MATTHEW DUNLAP, in his official capacity
as Secretary of State of Maine,

AARON FREY, in his official capacity as
Attorney General of Maine, and

JANET MILLS, in her official capacity as
Governor of Maine,

                 *Defendants*.

Civil Action No. 1:20-cv-00257-LEW

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

-ii-

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 1

    I.     Plaintiffs Will Succeed On The Merits .................................................... 1

          A.    Defendants Mischaracterize The Burden On Plaintiffs' Rights ................ 1

          B.    Defendants Misinterpret The Evidence. ................................................... 4

          C.    Defendants Have Failed To Meet Their Burden To Demonstrate That The Significant Burdens Imposed By The RCV Act Are Justified ................................................................................................. 6

    II.    Plaintiffs Have Satisfied The Remaining Factors .................................. 7

CONCLUSION .................................................................................................................. 8

CERTIFICATE OF SERVICE

**INTRODUCTION**

Plaintiffs face a serious risk of disenfranchisement. They have advanced significant empirical evidence showing that the complexity of the system created by Maine's Act to Establish Ranked-Choice Voting ("RCV Act") substantially burdens their ability to cast effective ballots that will be counted in the definitive round of the 2020 General Election. The evidence demonstrates that this burden weighs most heavily on older and less-educated voters, and that failure to cast effective ballots cannot be explained by deliberate choice alone. *See* Amended Expert Report ("McCarty Report") (Dkt. 14-1). The RCV Act causes severe harm.

Rather than confront Plaintiffs' evidence, Defendants attempt to evade it. They do not seriously dispute any of the empirical findings and conclusions in Professor McCarty's report. *See* Opp'n 24 n.10 (Dkt. 24). Indeed, they do not even mention—let alone contest—the discriminatory effects of the RCV Act on less-educated Maine voters. Instead Defendants speculate, counter to the record evidence and without support, that Professor McCarty's findings are consistent with voter choice. The only case they cite in support of their arguments—*Baber v. Dunlap*, 376 F. Supp. 3d 125 (D. Me. 2018)—was decided on a different factual record stemming from a single completed election. The substantially more robust evidentiary record here—which includes new demographic data—directly addresses concerns raised in *Baber* and demonstrates that this Court should enjoin ranked-choice voting in the 2020 General Election.

**ARGUMENT**

I.   **PLAINTIFFS WILL SUCCEED ON THE MERITS.**

   A.   **Defendants Mischaracterize The Burden On Plaintiffs' Rights.**

This case turns on the evidence before the Court. Burdens on the right to vote are weighed "under the sliding scale approach announced by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)."

1

*Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). That test requires a "fact-intensive analysis" that precludes the Court from "automatically concluding that the holding in [a former case] controls this case." *Gill v. Scholz*, 962 F.3d 360, 366 (7th Cir. 2020) (reversing under *Anderson-Burdick*); *see also Walgren v. Howes*, 482 F.2d 95, 98–100 (1st Cir. 1973).

*Baber* did not hold otherwise. There, this Court held that the burden caused by the RCV Act was minimal because those plaintiffs failed to produce sufficient "evidence of voter confusion or disenfranchisement." 376 F. Supp. 3d at 144. And the Court rightly left open the possibility that future challenges "based on specific facts" might succeed. *Id.* at 142 n.25. Accordingly, Defendants' attempts to portray *Baber* as deciding once for all time that "the RCV Act imposes a 'modest burden,' if any, on voters," Opp'n 13, invites reversible error. *Gill*, 962 at 366; *see also, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020) ("the record before us instead leads us to conclude that the burden on the right to vote here was significant").

It is axiomatic that voters have a right to have their votes counted. And that right can only be effectuated if the vote is counted in the determinative round of the election. *See Ayers-Schaffner*, 37 F.3d 726, 729 (1st Cir. 1994) (holding rule unconstitutional where it denied "the right to vote in the only [election] with any significance"); *Gray v. Sanders*, 372 U.S. 368, 381 n.12 (1963) ("being counted only for the purpose of being discarded" is "worth nothing"). To ensure an effective ballot in ranked-choice voting—*i.e.*, a ballot that cannot be exhausted and thus not counted in the determinative round—a voter must fully participate (*i.e.*, not truncate).

The record evidence before the Court in this case—which Defendants fail to rebut—shows that the complexity of ranked-choice voting severely burdens Maine voters' ability to cast an effective ballot. To begin, the plunge in the average rate of full voter participation under the RCV Act is eye-popping. Maine's pre-RCV Act average rate of full participation in plurality

2

elections was 97.3%.  McCarty Report 14.  Under the RCV Act, Maine's full participation rate has ranged from 35% to 59%.  *Id*. at 13.

Moreover, ballot truncation and exhaustion are most pronounced in Maine towns with higher numbers of older and less-educated voters.  McCarty Report 16–22.  The data show that for every 10-percentage point increase in seniors as a share of a town's population, there is an increase in truncated ballots of 2.9 percentage points, exhausted ballots of .5 percentage points, and all undervoting of .9 percentage points.  *Id*. at 21.  Similarly, a 10-percentage point increase in the non-college population increases truncation by 3.6 percentage points, exhausted ballots by .4 percentage points, and all undervoting by .7 percentage points.  *Id*.[1]

In addition, the 2018 Congressional Election featured a wide variety of irrational balloting.  For example, there were a significant number (17,352) of ballots exhibiting odd voting patterns—such as skipping rounds—that cannot be rationalized as strategic or expressive voter behavior.  McCarty Report 11–12 (Table 2).

The radically different outcomes in uncounted ballots among the 2018 races in Maine likewise show a severe burden.  In the 2018 down-ballot state senate plurality races—the vast majority of which were between only a Democrat and Republican—about 2% of voters cast ballots that were not counted.  McCarty Report 26.  In the 2018 ranked-choice race for Maine's second congressional district, by contrast, more than twice as many—nearly 5% of all ballots cast—were not counted.  *See id*. at 13, 26.  If uncounted ballots simply reflected independent voters making a deliberate choice not to vote Democrat or Republican, the rate of votes not counted should have been similar.  If anything, the rate of votes not counted should have been

---

[1]  In these figures, "exhausted ballots" refer to ballots that were not counted after the first round. "All undervoting" counts these exhausted ballots and ballots left blank in the first round. Contrary to Defendants' assertion, *see* Opp'n 19–20, Professor McCarty controlled for first-round undervotes in his definition of exhausted ballots, McCarty Report 5, 13.

*lower* in the federal race than in the down-ballot state legislative races.  The discrepancy shows that the higher rate of uncounted ballots is not consistent with deliberate voter choice.

The only plausible explanation for the empirical evidence in Professor McCarty's report is that voter confusion resulting from the complexity of the system causes a significant number of voters to truncate their ballots.  McCarty Report 2.  The lower rate of full participation and higher rate of exhaustion in Maine cannot be explained by voter choice or expression alone.  *Id.*; *see also* Am. Br. Princeton Electoral Innovation Lab ("PEIL")[2] 7–8 (Dkt. 25-1) (acknowledging the cognitive "cost" the RCV Act imposes on voters).  Defendants offer no contrary evidence.

Finally, ensuring an effective ballot compels some Plaintiffs to rank more candidates than they otherwise would.  These Plaintiffs must form and express nuanced opinions about the relative merits of candidates for whom they would not vote absent the threat of disenfranchisement.  *See* Hagopian Declaration ¶ 12; Trudel Declaration ¶ 12; *see also* Robinson Declaration ¶ 16.  This burden alone is severe.

### B.       Defendants Misinterpret The Evidence.

Defendants do not dispute the record evidence.  They do not challenge Professor McCarty's statistical analyses of ranked-choice voting or that the rate of full voter participation in the 2020 General Election will be substantially lower under the RCV Act than it would be under other forms of voting.  Nor do they take issue with Professor McCarty's regression analyses showing that the risk of ballot exhaustion will fall most heavily on older and less-educated Maine voters.

Instead, Defendants' primary contention is that Plaintiffs' evidence is not meaningful.

---

[2]  PEIL is not officially approved as a center or institute by Princeton University.  *See* Princeton University, *Councils, Centers and Institutes* (2020), https://ua.princeton.edu/academic-units/councils%2C-Centers-and-Institutes. Professor Sam Wang, PEIL's director, resides in the Department of Molecular Biology not the Department of Politics or School of Public Policy.

They contend Plaintiffs' evidence can be explained as reflecting deliberate voter "choices." Opp'n 20. Defendants hypothesize, without any empirical evidence, that voters may truncate their ballots out of dissatisfaction with "the major parties' candidates"[3] or to register a "protest vote." Opp'n 15, 24. As explained above, that theory is contrary to the record evidence. But it is also based on a misinterpretation of Professor McCarty's report.

As an initial matter, Defendants mischaracterize Professor McCarty's statement that "there is no strategic reason for a voter to undervote in an RCV election." Opp'n 15; *see* PEIL 7–8. A vote can be rational without being strategic. As Professor McCarty explains, the observation that a strategic voter will not truncate is merely ***the starting point*** for an analysis "on why a voter would decide to undervote." McCarty Report 17. The next step is to examine "what sorts of voters cast less than fully participating ballots that could result in exhausted ballots." *Id.* That examination reveals a strong empirical relationship between the proportion of truncated and exhausted ballots and the percentage of older and less-educated voters on the voter rolls that can only be explained by voter confusion. *Id.* at 21. Some voters may choose to truncate. But the evidence in the record demonstrates that a significant number of Maine voters truncate their ballots because they are confused.

Moreover, Defendants' contention that Plaintiffs' votes will be counted "[i]f they rank Susan Collins as their first preference" and "if she is a continuing candidate in every round" is beside the point. Opp'n 19; *see id.* at 9–10, 14–15. Plaintiffs are not claiming that every voter will be disenfranchised. Nor did Professor McCarty contend that every voter who truncated his ballot in 2018 was disenfranchised. Instead, as Defendants implicitly concede, Plaintiffs' votes ***will not be counted*** if Susan Collins ***is not*** a continuing candidate in every round. Plaintiffs are,

---

[3] Never mind that Maine's primary elections—which include only candidates from a single party—feature similar or larger rates of truncated and exhausted ballots. *See* McCarty Report 13.

in other words, at "risk of disenfranchisement." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319–23 (11th Cir. 2019).  That risk of disenfranchisement is undoubtedly a "serious burden" on their right to vote.  *Id.*; *see also Fish*, 957 F.3d at 1128.

Finally, as Maine's previous ranked-choice elections demonstrate, a significant number of voters will be disenfranchised when their votes are exhausted after the first round.  That is typical of RCV elections.  McCarty Report 6.  And Defendants' observation that many truncated ballots were counted in 2018 and may be counted in 2020 is cold comfort to those whose ballots, by law, are "not counted."  Me. Rev. Stat. tit. 21-A, § 723-A(2).  It also discounts Maine's history of successful independent candidates which increases the odds that a large number of voters may be disenfranchised.  McCarty Report 23 (discussing election of Angus King).  Most importantly, Defendants' arguments ignore the "basic truth that even one disenfranchised voter . . . is too many."  *League of Women Voters v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).  Indeed, Defendants offer nothing more than a superficial dismissal of Plaintiffs' cases invalidating regulations that similarly burden voting rights.  *Compare* Mot. 6–9 *with* Opp'n 17.[4]

## C.   Defendants Have Failed To Meet Their Burden To Demonstrate That The Significant Burdens Imposed By The RCV Act Are Justified.

Because Plaintiffs have demonstrated a burden on their right to vote, Defendants are now obligated to justify that burden.  *Burdick*, 504 U.S. at 434; *see Anderson*, 460 U.S. at 796–806.  The greater the burden, the greater the evidence Defendants must produce.  *Fish*, 957 F.3d at 1126 (collecting cases); *see Walgren*, 482 F.2d at 100.  Here, Defendants offer only a cursory

---

[4] PEIL claims that "exhausting a ballot *does not* equate to a voter's disenfranchisement" citing *Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011).  PEIL 2.  However, *Dudum* rested on the Ninth Circuit's willingness to reconceive San Francisco's RCV ordinance as imposing "a plurality system."  940 F.3d at 1111.  That path is foreclosed here because the Supreme Judicial Court of Maine has authoritatively determined that the RCV Act imposes "a *majority*" standard.  *Opinion of the Justices*, 162 A.3d 188, 211 (Me. 2017); *see Riley v. Kennedy*, 553 U.S. 406, 425 (2008) ("A State's highest court is unquestionably 'the ultimate exposito[r] of state law.'").

recitation of purported state interests unsupported by any evidence. *See* Opp'n 17–18. And

Professor McCarty has affirmatively shown that these same state interests cannot be supported

empirically. McCarty Report 23–28. It is therefore plain that Defendants cannot meet their

burden of justification under any standard of review.[5]

## II.     PLAINTIFFS HAVE SATISFIED THE REMAINING FACTORS.

Because Plaintiffs will succeed on their constitutional claims, enforcement of the RCV

Act "unquestionably constitutes irreparable injury." *Sindicato Puertorriqueno de Trabajadores*

*v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012) (citation omitted); *see* Mot. 18–19.

Moreover, the balance of equities and the public interest likewise favor Plaintiffs. Mot.

19–20. Defendants do not dispute that any administrative burden associated with converting the

2020 General Election to a plurality standard would be minimal given that Maine already must

use that standard for state races.

Defendants nevertheless assert that Plaintiffs should have brought this action sooner

because it was ripe when, in April 2020, the Secretary determined that non-party petitions

submitted by Lisa Savage "contained 5,221 valid voter signatures." Flynn Decl. ¶¶ 6–7; *see*

Opp'n 26. However, the Secretary did not announce that determination until June 2020 and,

even then, Plaintiffs' claims may not have ripened until July 2020. Mot. 2 n.1; *cf. Maine*

*Republican Party v. Dunlap*, 324 F. Supp. 3d 202, 206 (D. Me. 2018) (deciding claims "14 days"

before primary election where "the Secretary has already printed ballots"). This action is timely.

---

[5] For similar reasons, Defendants fail to overcome Plaintiffs' showing of constitutional injury
under the First Amendment, Due Process Clause, Equal Protection Clause, and Twenty-Sixth
Amendment. On compelled speech, Defendants acknowledge that some voters "may not wish to
be associated with" some candidates but assert that they "are not compelled" to rank these
candidates (even though voluntary truncation risks disenfranchisement). Opp'n 21, 24. The
argument overlooks that just as the government may not compel speech directly, it also may not
condition a fundamental right—here, the right to cast an effective ballot—on unwanted speech.
*See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

## CONCLUSION

In light of the foregoing and for the reasons stated in Plaintiffs' Motion for Preliminary

Injunction and Incorporated Memorandum of Law, the Court should enter an order enjoining

enforcement of the RCV Act.

Respectfully submitted,

August 7, 2020                                    By:    /s/ Fred W. Bopp III
                                                         Fred W. Bopp III
                                                         **BOPP & GUECIA**
                                                         298 Main Street
                                                         Yarmouth, ME 04096
                                                         Telephone: 207-846-6111
                                                         fbopp@boppguecia.com

                                                         Michael E. Toner*
                                                         Stephen J. Obermeier*
                                                         Brandis L. Zehr*
                                                         Jeremy J. Broggi*
                                                         **WILEY REIN LLP**
                                                         1776 K Street NW
                                                         Washington, DC 20006
                                                         Telephone: 202-719-7000
                                                         MToner@wiley.law
                                                         SObermeier@wiley.law
                                                         BZehr@wiley.law
                                                         JBroggi@wiley.law

                                                         *Counsel for Plaintiffs*

                                                         *Certifications for Admission Pro Hac Vice
                                                         Filed July 23, 2020*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2020, a true and correct copy of the foregoing Reply
was electronically filed with the Clerk of the Court through the CM/ECF system, causing service
to be effected on all registered counsel of record for all parties via CM/ECF and is available for
viewing and downloading from the CM/ECF system.


s/ Fred W. Bopp III
Fred W. Bopp III