UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT HAGOPIAN, DUANE R. LANDER, STERLING B. ROBINSON, and JAMES T. TRUDEL, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:20-cv-00257-LEW |
| | ) | |
| MATTHEW DUNLAP, in his official capacity as Secretary of State, AARON FREY, in his official capacity as Attorney General, and JANET MILLS, in her official capacity as Governor of the State of Maine, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

In this action, the Plaintiffs, four registered Maine voters who intend to vote for Susan Collins in the 2020 election, request that a United States District Court judge issue an order invalidating Maine's ranked-choice voting system on constitutional grounds. The matter is before me on Plaintiffs' Motion for Preliminary Injunction (ECF No. 3).

## BACKGROUND

The State of Maine uses a system of ranked-choice voting ("RCV") for federal elections. RCV operates on a simple set of rules. The ballot identifies all of the candidates for the federal office in question and asks the voter to rank them by order of preference. If no candidate achieves a majority of the votes cast in the initial count, the candidate with the fewest votes is eliminated and the ballots that named that candidate as the first choice

1

are reviewed to see if they expressed a preference for the remaining candidates.  Ballots that contain a preference among remaining candidates are counted for those candidates. Ballots that do not contain such a preference are "exhausted," meaning they are no longer counted toward determining who will win.  21-A M.R.S. § 723-A.[1]  Defendants submitted a sample RCV ballot, the July 2020 Second District Republican Primary Ballot (ECF No. 26), to demonstrate what the ballot will look like for Plaintiffs in November:



<hr>

[1] In Maine, RCV applies only to federal elections and state primary elections.  *See Baber v. Dunlap*, 376 F. Supp. 3d 125, 128-29 & n.2 (D. Me. 2018), *appeal dismissed*, No. 18-2250 (1st Cir. Dec. 28, 2018); *Maine Republican Party v. Dunlap*, 324 F.Supp.3d 202, 204–06 (D. Me. 2018); *Maine Senate v. Sec'y of State*, 183 A.3d 749 (Me. 2018); *Opinion of the Justices*, 162 A.3d 188 (Me. 2017).

> The First Article of the Constitution … assigns to the People of the several States the authority to choose their representatives to the national Congress, and directs that the States shall prescribe the times, places, and manner by which representative are chosen. Though Congress has the power to regulate state elections, "if there be no overruling action by the Congress" then suitable regulations "may be provided by the Legislature of the state upon the same subject." *Smiley v. Holm*, 285 U.S. 355, 367 (1932).

*Baber*, 376 F. Supp. 3d at 134.

Voters can express their preferences in different ways under Maine's RCV system. They can rank each and every candidate, or they can rank fewer than all candidates. Data from the 2018 Second Congressional District tells us that most voters did not rank every candidate. Regardless, if a voter picks a "continuing" candidate for first place, i.e., a candidate who is not eliminated in the first round, his or her first place vote for that candidate continues to the second round of vote tabulation. If not, such a voter can still have a say in the outcome provided he or she ranked one of the continuing candidates higher than, or to the exclusion of, the other continuing candidate(s).

Rather simple, really. Voters can behave as they would in a traditional plurality election by selecting a first-preference candidate and no other, and rest assured that their vote will be counted so long as their candidate continues in the rounds of tabulation; or voters can take the trouble of ranking some or all candidates, if the voters are concerned that their first choice candidate is not likely to win and they have a preference among the remaining candidates. Plaintiffs, in fact, took three different approaches to RCV voting in the 2018 election, and each approach ensured that their ballots were counted toward Bruce Poliquin in the final round of tabulation.

Robert Hagopian describes himself as a retired educator and businessman in his 70s with a college degree. In the 2018 Second Congressional District election, he ranked every candidate, leading with Bruce Poliquin. He did not wish to express support for the other candidates, but says he did so out of fear that, if Bruce Poliquin was eliminated, his ballot would be "discarded." He intends to vote in the 2020 Senate race and to once again rank every candidate, he says, in case his first choice, Senator Susan Collins, is eliminated in

3

the course of successive rounds of ranked choice tabulation. However, Mr. Hagopian finds it offensive that he should have to rank Sara Gideon at all, even though he intends to rank her last among all candidates. Hagopian Declaration (ECF No. 1-2) & Testimony.

Duane Lander tells us he is a United States Army veteran, retired engineer, and former state house representative, age 79 as of the filing of the complaint, with multiple college-level degrees. He states that ranked choice voting confuses him and that he ranked Bruce Poliquin as his choice in every column on the ballot in 2018. He states (incorrectly) that it was his understanding that if he only selected Mr. Poliquin in the first-round column, his vote would not have counted in later rounds. In his Declaration, he asserts that he still thinks that is how it works, even after talking to unnamed experts on the subject, although his testimony was equivocal on this point. He intends to cast his vote for Susan Collins in the very same manner as he did for Mr. Poliquin (choosing her in every column). Lander Declaration (ECF No. 1-3) & Testimony.

Sterling Robinson identifies as "an eighth-generation Mainer," in his 70s, with some college education and a lifetime of practical experience. In the 2018 election, he (and a great number of others) cast his ballot by filling in the first-choice circle for Bruce Poliquin and leaving all other circles empty. He states that he understands now, but did not understand then, that his approach "risked" having his ballot exhausted. This year, he intends to vote for Susan Collins in column one, and he says he will rank every candidate. In his Declaration, he states he does not understand "how to rank the candidates to both ensure that [his] preferred candidate is in the best position to win while ensuring that [his] ballot will not be exhausted." He says he is "concerned that in attempting to ensure [his]

4

ballot is counted, [he] could unknowingly undermine [his] voting interests."  Robinson Declaration (ECF No. 1-4).  Mr. Robinson's testimony was consistent with this position.

James Trudel describes himself as a retired Lieutenant Colonel of the Maine Air National Guard and former electrical engineer with a college degree, also in his 70s.  Mr. Trudel is registered as an independent voter, but he does not wish to express any support for candidates with whom he does not agree.  In the 2020 race, he intends to vote for Senator Collins as his first choice, but will rank all of the other candidates as well, including Sara Gideon (in the last column, he advises).  He considers it a violation of his political convictions to rank the other candidates.  Trudel Declaration (ECF No. 1-5) & Testimony.

Although there is no evidence to suggest that the ballots cast by the four Plaintiffs were not counted in every round of the 2018 RCV election, the Plaintiffs contend that they can prove that "nearly two thirds of Maine voters [were] denied full participation in the 2018 Congressional Election and thus [were] placed at risk of disenfranchisement"; "that the average rate of full voter participation and the actual rate of disenfranchisement are much worse under the RCV Act than under other types of voting systems"; and that "empirical demographic data demonstrat[es] that the RCV Act disproportionally burdens the right to vote of older and less-educated Mainers."  Complaint ¶ 248.

They allege: in the First Claim for Relief, an undue burden on their First and Fourteenth Amendment rights to vote effectively; in the Second Claim,  a violation of their First and Fourteenth Amendment rights not to be compelled to vote for someone they do not support; in the Third Claim, a violation of procedural due process under the Fourteenth Amendment; in the Fourth Claim, a violation of equal protection guaranteed them by the

Fourteenth Amendment; and in the Fifth Claim, abridgment of their Twenty-Sixth Amendment rights to vote based on age. *Id.* ¶¶ 249-314.

In support of their Motion for Preliminary Injunction, Plaintiffs have enlisted an expert witness, Nolan McCarty, Ph.D., Professor of Politics and Public Affairs at Princeton University.   In his Expert Report, Professor McCarty presents voter data from Maine's 2018 RCV election and two primary races, and expresses certain opinions about what he thinks the data reveal.   Because the Expert Report is designed to present Plaintiffs' legal position as favorably as possible through selective statistical sampling methods, I am free to regard the Report critically and need not accept its representations, or Professor McCarty's hearing testimony, as undisputed statements of fact.   For reasons I will relate, although Professor McCarty's presentation is helpful, I do not consider his expert findings persuasive.

Professor McCarty's lead analytical point is definitional.   He says, normatively and not empirically as he claims, that voters who cast their ballots the way Mr. Robinson did in 2018 (voting for one candidate in round one and leaving the remaining rounds blank), fail to "fully participate" in an RCV election and behave in a manner "hard to rationalize." Expert Report at 10 (ECF No. 1-1).   However, every voter who selected either Bruce Poliquin or Jared Golden as their only choice in column one, without expressing alternative preferences for subsequent rounds, in fact, fully participated in the 2018 election.   By regarding these voters as irrational participants in the election, frankly, Professor McCarty disregards the reality of Maine's 2018, information-age election, in which voters could – *quite rationally* – expect that the final two contestants would be Mr. Poliquin and Mr.

Golden.  Indeed, most voters (i.e., voters of all ages and educational backgrounds) cast their ballots with this presumption in mind and did not rank every candidate.

By building his report on the faulty premise that ranking only one candidate or fewer than $n$-1 candidates is an irrational "failure" to "fully participate," Professor McCarty has substantially eroded the likelihood that I would ultimately consider his expert opinions dispositive of the merits.  Although I recognize that there are theoretical scenarios in which having three or more highly competitive RCV candidates can result in the election of someone other than the so-called Condorcet winner,[2] especially when many voters rank only one losing candidate, I do not see that the mere potential of this statistical curiosity proves a violation of the First, Fourteenth, or Twenty-Sixth Amendments.  After all, the non-Condorcet winner scenario is not unique to RCV races.

Plaintiffs, evidently, are no more persuaded by the "full participation" red herring than am I.  They have asked Professor McCarty to supplement his report with a statement concerning any age- or education-based discrepancies he can identify in the data, even though each of the Plaintiffs cast a fully effective ballot.  According to Professor McCarty, when one looks at the ballots from the 2018 Second Congressional District election and considers the percentage of votes exhausted, by town (omitting all towns in which fewer than 200 persons turned out to vote), cross referencing the percentage of senior citizens in the town's population, and then placing some unspecified additional weight on data sets

---

[2] A "Condorcet winner" is the candidate who would be able to defeat all other candidates in a series of pairwise elections.  Political scientists like Dr. McCarty use this term as a way to measure the efficiency of a voting procedure by the probability that it will elect the Condorcet winner, given that a Condorcet winner exists.

from "larger" towns, "[t]he expected difference between the town with the lowest proportion of seniors to the one with the most corresponds to a 1.2 percentage point increase in ballot exhaustion." Expert Report at 17 & n.25. Using the same supposedly "empirical" method to measure the impact of education, according to Professor McCarty, the expected difference between the "least-educated" town and the "most educated,"[3] is even greater: "1.7 percentage points more exhausted ballots."[4]  *Id.* at 18.  Professor McCarty also purports to know, for the same election, that the ballots of non-college voters were exhausted at a rate of 3.8 percent and the ballots of persons over age 65 were exhausted at the rate of 5.1 percent.  Expert Report at 19.

Professor McCarty's assertions are troubling, not because of the numbers he gives, but because the data available to him do not tell him who in a town with a high percentage of seniors or high percentage of non-college educated voters (or both) cast the exhausted ballots.[5]  For all we know, a town may have had a larger than normal turnout of voters

---

[3] Professor McCarty seems to have drawn a line between college and "non-college" voters.  Presumably this approach is based on the available demographic data concerning the entire population of the towns in question, not the narrower population of registered voters.

[4] Professor McCarty also maintains that there is something inherently wrong with RCV because some voters choose not to rank either of the candidates who make it to the final round, resulting in "exhaustion" of their ballots.  He compares this to the runoff system of voting, in which state's have a second round of live voting when no candidate achieves a majority victory following the first vote count.  In such systems, which nobody to my knowledge believes are unconstitutional, there is the common phenomenon of "falloff," when fewer voters turn out for the runoff election.  The comparison between exhaustion and falloff does RCV no harm, as Professor McCarty's Report states that in a runoff election, voter turnout, more often than not, is reduced by more than 10%, a significantly higher percentage rate than the percentage of exhausted ballots in Maine's RCV elections.  Expert Report at 14.

[5] The Princeton Electoral Innovation Lab warns me that Professor McCarty is engaging in an unreliable "ecological inference" when he assumes that it is the senior and non-college voters who are responsible for an uptick in the rate of exhausted ballots in some towns.  Brief of *Amicus Curiae* Princeton Electoral Innovation Lab (ECF No. 25-1).

who simply refused to vote for either major party candidate.  Ultimately, the data does not support a finding that one needs youthful vigor or a college education to understand how to cast an effective RCV ballot in Maine.

Ultimately, Professor McCarty's conclusion regarding the ballot data strikes me as equal parts inductive reasoning and condescension.  Among the many things it fails to account for are those who cast their ballots with exclusive support for one candidate in mind based on the likelihood that the major-party candidates will continue to the final round of tabulations.  It fails also to account for voters who rank only one candidate as a kind of political protest against the whole idea of ranked-choice voting.  So too the quixotic voter; those who vote in the W.C. Fields tradition.[6]   It fails to consider the voter who simply chooses to support only one candidate regardless of whether that candidate continues to the final round, much like the many voters who do not return to cast a ballot in states that conduct runoff elections.  To be fair, Professor McCarty concedes that there are reasonable alternative explanations for the type of voter behavior he finds "hard to rationalize."   But he jettisons the other alternative explanations of voter behavior as unlikely because they could not have occurred in such numbers.  This strikes me as circular reasoning.  The fulcrum of Professor McCarty's conclusion is what he describes as his "reasonable inference" that older and less educated voters of Maine's Second Congressional District are acting confused rather than rational when it comes to casting a ranked-choice ballot.  I did not hear anything in the testimony which might explain why

---

[6] "I never vote for anybody, I always vote against."  ROBERT LEWIS TAYLOR, W.C. FIELDS, HIS FOLLIES AND FORTUNES, 228 (1950).

this inference is reasonable, other than that the ballots Professor McCarty finds "hard to rationalize" occurred in numbers too large to be explained by intelligent voting alone. It is at this point in his testimony and argument by counsel that we took several trips around an intellectual cul de sac. How Plaintiffs' expert witness can detect voter confusion as opposed to deliberate choice based on rather wobbly demographic data from 2018 is anybody's guess. Is it because some variant social science instructs us that we would not expect such large numbers of Mainers able to make purposeful voting decisions unless those ballots are ranked in a way that Professor McCarty finds easier to rationalize? I do not know, and Professor McCarty does not say. To the extent any conclusions can be drawn from such voter behavior it is that the RCV Act provides voters with choices as to whether and to what extent to rank candidates. It may not be surprising to find that many thousands of voters in 2018 availed themselves of their choices. Some ranked the candidates and others did not. But the voters fully participated

## DISCUSSION

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World*, *Inc. v. MDTV Med. News Now*, *Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16). When this inquiry reveals that the party seeking preliminary injunctive relief is unlikely to prevail on the merits, a motion for such relief can be denied on that basis alone, and the remaining factors can be treated as "matters of idle curiosity." *Russoman v. Novo Nordisk Inc*., 960 F.3d 48, 53 (1st Cir. 2020).

## A.   LIKELIHOOD OF SUCCESS

The evidence before me on the Motion for Preliminary Injunction persuades me that Plaintiffs are not likely to succeed on the merits of their constitutional challenge to Maine's RCV Act.

### 1.  First Claim – Undue Burden on the Right to Cast an Effective Ballot

Plaintiffs' First Claim is not likely to succeed for a simple reason. Each Plaintiff effectively cast his ballot in 2018 and can be expected, based on his declaration, to do so again in 2020. There is no burden on the Plaintiffs' right or ability to cast an effective vote for Senator Collins.[7] And assuming, *arguendo*, that Plaintiffs succeed in identifying a

---

[7] The Supreme Court has explained:

> [B]urdening access to the ballot, rights of association in the political party of one's choice, interests in casting an effective vote and in running for office, … is to infringe interests certainly as substantial as those in public employment, tax exemption, or the practice of law. For "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights ..." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

burden,[8] Defendants are likely to establish that the burden is a rational and fair means of conducting an election. *Baber*, 376 F. Supp. 3d at 144.

## 2. Second Claim – Compelled Speech

Plaintiffs very much do not want to cast a ballot for anyone other than Senator Collins, and they argue RCV compels them to express themselves in favor of the also-ran candidates and, evidently worse in their minds, the Democratic candidate. They argue this violates their First Amendment rights by forcing them to "engag[e] in expressive conduct that violates their firmly held political convictions" or "risk[] having their ballots discarded in the 2020 election." Complaint ¶ 295. The 2018 election data analyzed by Dr. McCarty and the structure of RCV do not support the argument that RCV puts Plaintiffs, or any other Maine voters, to such a Hobson's choice.

Since the beginning of the Republic compelled speech has been contrary to the freedoms guaranteed by the First Amendment. Thomas Jefferson powerfully observed that "to compel a man to furnish contributions of money for the propagation of opinions which

---

"Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

*Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 449–50 (1974).

[8] The burden Plaintiffs identify is the "risk of disenfranchisement" for those voters who fail to "fully participate," rather than any actual disenfranchisement RCV imposes. Motion at 13, citing *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3 d 1312, 1319 –23 (11th Cir. 2019) (finding "serious burden" where "5 hundredths of a percent" of voters faced "risk of disenfranchisement" due to state's signature-matching procedure). Any "risk of disenfranchisement" here, however, is the product of voter choice, not the structure of the RCV system; RCV no more disenfranchises Plaintiffs or other Maine voters than a plurality system "disenfranchises" those who vote for a losing candidate. *See Dudum v. Arntz*, 640 F.3d 1098, 1110 (9th Cir. 2011) ("'[E]xhausted' ballots are counted in [San Francisco ranked choice mayoral] election, they are simply counted as votes for losing candidates, just as if a voter had selected a losing candidate in a plurality or runoff election.").

he disbelieves and abhor[s] is sinful and tyrannical."  A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950).  The Supreme Court has prevented state governments from compelling speech in line with this principle.  *See, e.g., Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31,* 138 S. Ct. 2448, 2459–60 (2018) (finding an Illinois law forcing public employees "to subsidize a union, even if they choose not to join and strongly object to the positions the union takes" violated the First Amendment).  An important prerequisite to a compelled speech claim, however, is evidence that the state or federal government is forcing an individual to speak.  *Id.* at 2464.

Plaintiffs' claim is unlikely to succeed for a simple reason.  RCV does not compel Plaintiffs to vote for anyone.  Maine's ranked-choice ballots explicitly tell voters to "fill in the oval in the first column for your first choice candidate, in the second column for your second choice candidate," and to "[c]ontinue until you have ranked as many or as few candidates as you like."  ECF No. 26 at 3.  Unlike in *Janus,* where Illinois "forced [employees] to subsidize a union," Maine's RCV Act does not force voters to rank any candidate they do not wish to support.  Plaintiffs are free to vote for Senator Collins exclusively without fear that their preference will be disregarded during vote tabulation.  Because Plaintiffs' votes for Senator Collins will be counted, and because Maine does not force them to vote for anyone else, I find they are unlikely to succeed on a compelled speech claim under the First Amendment.

### 3.  Third Claim – Procedural Due Process

Plaintiffs all cast effective ballots for Bruce Poliquin in 2018 and undoubtedly will cast effective ballots for Susan Collins in 2020.  Given this reality, Plaintiffs are not likely to prove that RCV has or ever will deprive them of an interest protected by the Due Process Clause of the Fourteenth Amendment, and to the extent they succeed in identifying a burden, Defendants are likely to establish that the burden is a rational and fair means of conducting an election.  *Baber*, 376 F. Supp. 3d at 144.

### 4.  Fourth Claim – Equal Protection

Plaintiffs allege that "the RCV Act accords some votes more weight than others." Complaint ¶ 309.  This contention is chimerical.  As I found in *Baber v. Dunlap*, 349 F. Supp. 3d 68, 77 (D. Me. 2018):

> It appears that Maine's RCV system is designed to enable every voter the opportunity to express a preference, and be counted, with respect to the candidates most likely to win the election. Plaintiffs, it seems, have expressed their preference fully and equally on that matter. They have not demonstrated disparate treatment, let alone a discriminatory intent. The RCV Act, after all, is party-blind.
>
>> A voter complaining about [a nondiscriminatory] law's effect on him has no valid equal-protection claim because, without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional. *See*, *e.g.*, *Washington v. Davis*, 426 U.S. 229, 248 (1976). The Fourteenth Amendment does not regard neutral laws as invidious ones, even when their burdens purportedly fall disproportionately on a protected class. A fortiori it does not do so when, as here, the classes complaining of disparate impact are not even protected. [citation omitted]
>
> *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 207 (2008) (Scalia, J., concurring in judgment upholding photo identification requirement).

Plaintiffs are not likely to succeed on the merits of this equal protection theory because they have not identified discriminatory intent or impact.[9]

### 5. Fifth Claim – Twenty-Sixth Amendment

The Twenty–Sixth Amendment to the Constitution of the United States provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." Though the Twenty-Sixth Amendment was ratified to protect the voting rights of the young, its text suggests it may protect any citizen over eighteen whose right to vote is denied or abridged "on account of age." *Compare Walgren v. Howes,* 482 F.2d 95, 102 (1st Cir. 1973) (indicating "the class as a whole which is protected by the Twenty-Sixth Amendment" may be limited to 18-to-21 year-olds) *with* Eric S. Fish, The Twenty-Sixth Amendment Enforcement Power, 121 Yale L.J. 1168, 1175 (2012) (noting the textual parallels between the Fifteenth and the Twenty-Sixth Amendments, and arguing the text of the Amendment ought to protect old as well as young voters). Although they bring a Twenty-Sixth Amendment claim, Plaintiffs fail to cite any legal authority to back up their argument that the Amendment ought to protect voters in their 70s.

Nevertheless, assuming the Twenty-Sixth Amendment *does* protect older voters as a class, the evidence does not entitle Plaintiffs to preliminary injunctive relief. The First Circuit has heard Twenty-Sixth Amendment challenges to state action before, and has

---

[9] Presumably this burden falls to Plaintiffs given the absence of any suspect classification. *Compare Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 797 (2017), and *Fisher v. University of Texas*, 570 U.S. 297, 310 (2013). In any event, Defendants have demonstrated the negative, assuming the burden falls to them.

required some direct evidence that the state has denied or abridged those voters' ability to vote to state a cognizable claim. *See Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364 (1st Cir. 1975). As I indicated above, I do not credit Professor McCarty's Expert Report as evidence that RCV burdens Mainers' constitutional right to vote, or that it in any way discriminates against Mainers based on age. Without any evidence that Maine's RCV system denies or abridges Plaintiffs' right to vote, therefore, I find Plaintiffs are not likely to succeed on the merits of their Fifth Claim.

**B.    IRREPARABLE INJURY**

To show they are entitled to preliminary injunctive relief, Plaintiffs must show they will suffer irreparable injury if RCV is utilized at this year's general election. *Arborjet*, 794 F.3d at 171.

Having concluded that Plaintiffs are not likely to succeed on the merits of their constitutional claims, and that nothing in the design or implementation of RCV in Maine will prevent them from casting fully effective ballots in the upcoming election, there is no injury, let alone irreparable injury, to redress.

**C.    BALANCE OF EQUITIES**

To obtain preliminary injunctive relief, Plaintiffs must also show "a balance of equities in [their] favor." *Id.* In the absence of a hardship, the equities test does not avail Plaintiffs.

**D.    PUBLIC INTEREST**

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance

or denial of injunctive relief." *Everett J. Prescott*, *Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005)).  Majorities of the Maine voting public have expressed repeatedly at the polling booth that they want RCV.  An award of injunctive relief setting aside RCV for the 2020 election would undermine rather than safeguard the most relevant public interest.

## CONCLUSION

Plaintiffs are hardly alone in their view toward ranked-choice voting.  Critics warn that it is an ahistorical and gimmicky solution in search of a problem intended to advantage one party over another.  Advocates promise that it will increase voter participation and remove some of the negativity from modern political campaigning.  The debate about whether ranked-choice voting makes sense for Mainers as a method by which to choose their elected representatives is likely to continue for some time.  My limited charge is to determine only whether the RCV Act is contrary to the text of the United States Constitution.  It is not.  As I stated following my first encounter with RCV litigation: "The remedy in a democracy, when no constitutional infirmity appears likely, is to exercise the protected rights of speech and association granted by the First Amendment to persuade one's fellow citizens of the correctness of one's position and to petition the political branch to change the law." *Baber*, 349 F. Supp. 3d at 80.  Defendants have persuaded me that Plaintiffs have not presented claims warranting the extraordinary and drastic remedy of a judicial order setting aside RCV in Maine.  Plaintiffs' Motion for Preliminary Injunction (ECF No. 3) is DENIED.

**SO ORDERED.**

Dated this 14th day of August, 2020.

                                /s/ Lance E. Walker
                                UNITED STATES DISTRICT JUDGE